Myrna UNDERWOOD et al., Plaintiffs,

v.

Carla A. HILLS, Individually and in her official capacity as Secretary of the United States Department of Housing and Urban Development

and

H. R. Crawford, Individually and in his official capacity as Assistant Secretary for Housing Management of the United States Department of Housing and Urban Development, Defendants.

Civ. A. No. 76–469.

United States District Court, District of Columbia.

June 8, 1976.

**528**

Lynn E. Cunningham, Washington, D. C., for plaintiffs.

Paul T. Michael, Dept. of Justice, Washington, D. C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

This is a nationwide class action brought by tenants in federally subsidized, multi-family housing projects to obtain an operating subsidy enacted by Congress in 12 U.S.C. § 1715z–1(f)(3) and (g) to enable these projects to keep pace with mounting utility bills and local property taxes and at the same time to maintain rents at and to reduce rents to levels appropriate for lower income tenants. Faced with comparable actions, at least nine district courts throughout the United States have already held that payment of this operating subsidy is mandatory. This Court agrees and enters the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. Each of the named plaintiffs is a tenant in a housing project federally subsidized pursuant to 12 U.S.C. § 1715z–1, and each pays more than 30% of his or her adjusted monthly income for rent. Costs of local property taxes and utilities have increased in each of the housing projects in which the named plaintiffs reside, and such increased costs have been or will be passed on to the named plaintiffs in the form of increased rents.

2. Plaintiffs represent a nationwide class of similarly situated tenants. The class is so numerous that joinder of all members is impracticable; there are more than 3,600 federally subsidized housing projects in the United States which are eligible for additional assistance payments for operating subsidies. There are questions of law and fact common to the class; the central issue of this case which is common to all class members is whether the defendant has a mandatory duty to implement the operating subsidy provisions of 12 U.S.C. § 1715z–1(f)(3) and (g). The claims of the named plaintiffs are typical of the class in that the named plaintiffs claim that they are being illegally required to bear the financial burden of increasing costs of property taxes and utilities in their housing projects which HUD is required by law to subsidize. The named plaintiffs will fairly and adequately protect the interest of the class. Defendant has acted on grounds generally applicable to the class by illegally refusing to implement the operating subsidy program nationwide, thereby making appropriate final injunctive and declaratory relief with respect to the class as a whole.

3. The cost of local property taxes and utilities in most housing projects nationwide which are federally subsidized pursuant to 12 U.S.C. § 1715z–1 have increased since the projects first became fully occupied. These increased costs have been passed on to plaintiffs and the class they represent in the form of increased rents or will be so passed on if operating subsidies are not paid, with the result that plaintiffs and members of the class have been or will be required to pay more than 30% of their adjusted monthly income for rent.

4. Defendant Carla Hills is the Secretary ("Secretary") of the Department of Housing and Urban Development ("Department") and is responsible for executing, personally and through subordinates, 12 U.S.C. § 1715z–1 (Section 236).

5. The matter in controversy as to each plaintiff exceeds the sum of $10,000, exclusive of interest and costs, and arises under Section 236.

6. Congress enacted the National Housing Act to provide adequate housing to "families with incomes so low they could not otherwise decently house themselves. . . ." 12 U.S.C. § 1701t. Section 236 is intended to further this goal by authorizing the Secretary to make interest reduction payments to mortgagees and to insure mortgages of Section 236 projects on behalf of the owner/mortgagors. 12 U.S.C. § 1715z–1(a) and (j). This subsidy, commonly referred to as the "production subsidy," enables project owners to charge lower rents to the tenants, since the subsidy results in lower operating costs. In return for the benefits of interest reduction payments and mortgage insurance, the project owners are strictly regulated in the rents that they may charge and the profits that they may make. *See id.,* § 1715z–1(f)(1) and (e); 24 C.F.R. § 236.55; FHA Form No. 3136, ¶ 4(a), (b), (c), (*l*), and 6(e)(1).

7. In 1974 Congress enacted the Housing and Community Development Act, Pub.L. 93–383, 88 Stat. 633, which added Section 236(f)(3) and amended Section 236(g) so as to provide for an "operating subsidy"—in addition to the production subsidy—to cover increased utility costs and local property taxes and thereby prevent such costs from being passed on to tenants. 12 U.S.C. § 1715z–1(f)(3) and (g). Section 236(f)(3) provides in pertinent part:

"For each project there shall be established an initial operating expense level, which shall be the sum of the cost of utilities and local property taxes payable by the project owner at the time the Secretary determines the property to be fully occupied, taking into account anticipated and customary vacancy rates. At any time subsequent to the establishment of an initial operating expense level, the Secretary is authorized to make, and contract to make, additional assistance payments to the project owner in an amount up to the amount by which the sum of the cost of utilities and local property taxes exceeds the initial operating expense level, but not to exceed the amount required to maintain the basic rentals of any units at levels not in excess of 30 per centum . . . of the income of tenants occupying such units. Any contract to make additional assistance payments may be amended periodically to provide for appropriate adjustments in the amount of the assistance payments. Additional assistance payments shall be made pursuant to this paragraph only if the Secretary finds that the increase in the cost of utilities or local property taxes is reasonable and is comparable to cost increases affecting other rental projects in the community." 12 U.S.C. § 1715z–1(f)(3).

Section 236(g) provides:

"The project owner shall, as required by the Secretary, accumulate, safeguard, and periodically pay to the Secretary all rental charges collected in excess of the basic rental charges. Such excess charges shall be credited to a reserve fund to be used by the Secretary to make additional assistance payments as provided in paragraph (3) of subsection (f) of this section. During any period that the Secretary determines that the balance in the reserve fund is adequate to meet the estimated additional assistance payments, such excess charges shall be credited to the appropriation authorized by subsection (i) of this section and shall be available until the end of the next fiscal year for the purpose of making assistance payments with respect to rental housing projects receiving assistance under this section. For the purpose of this subsection and paragraph (3) of subsection (f) of this section, the initial operating expense level for any project assisted under a contract entered into prior to August 22, 1974, shall be established by the Secretary not later than 180 days after August 22, 1974." 12 U.S.C. § 1715z–1(g).

8. The Housing and Community Development Act of 1974 also amended Section 236 to provide for a "deep subsidy" in addition to the production subsidy. The deep subsidy is a type of rent supplement paid to owners of projects made subject to contracts under Section 236 after August 22, 1974, generally on behalf of tenants whose

incomes are too low to afford basic rentals with 25 percent of their income. 12 U.S.C. § 1715z–1(f)(2).

9. In light of rising operating costs that were jeopardizing the viability of many projects, the Senate Banking, Housing and Urban Affairs Committee proposed the operating subsidy amendments to Section 236 specifically "to prevent excessive rent increases and assist sponsors in meeting increases in operating costs beyond their control. . . . " S.Rep. No. 93–693, 93rd Cong., 2d Sess. (1974), 3 U.S.Code Cong. & Admin.News, pp. 4273, 4302 (1974). The Committee explained:

"The Committee was concerned with the problem experienced by projects where [operating] costs rise above those initially projected. Under the present program, there is no way of adjusting the subsidy to meet such costs, with the result that the burden falls upon lower income tenants, who may thus be required to pay far more than 25 percent of their incomes for their apartments." *Id.* at 4303.

Without proposing a solution, the House Committee on Banking and Currency similarly observed:

"One of the problems with the Section 236 rental assistance program is that the amount of the subsidy is fixed for forty years. Thus as real estate taxes and other operating costs increase at a rate faster than the incomes of tenants, rents must be increased until at some point the project becomes economically unfeasible, vacancies mount, and the project fails." H.S.Rep. No. 1114, 93rd Cong., 2d Sess. 21 (1974).

The operating subsidy program was intended to solve these problems. In the Secretary's own words, "The operating subsidy amendments were enacted to alleviate the financial hardships, generated by escalating utility rates and tax increases, which threaten the owners of HUD subsidized, multifamily projects and the tenants residing in those projects." Affidavit of Carla Hills, sworn to on March 23, 1976, ¶ 8, filed in this case.

10. The excess rental reserve fund created under Section 236(g) contained at least $46,328,900 as of March 31, 1976. The Department estimates that it will return $18 million of that sum to project owners by a retroactive implementation of Transmittal No. 24, which sets forth a new method for calculating amounts that project owners are to contribute to the reserve fund.

11. As of September 30, 1975, the Department effectively had a balance of unreserved contract authority for implementation of Section 236 of at least $90,757,490. As of February 29, 1976, this balance totaled at least $39.8 million. Of this amount the Department plans to use: (a) $27.2 million to contract or to amend contracts for production subsidies; (b) another $5.8 million for deep subsidies pursuant to Section 236(f)(2); and (c) the remaining $6.8 million for deep subsidies to Section 236 projects that had received a commitment by the Department for production subsidies before August 22, 1974, but were not finally endorsed nor receiving production subsidy payments until after that date.

12. Except as required by court order in lawsuits before this one, the Secretary has made no effort to implement the operating subsidy program, notwithstanding her legal duty to do so.

13. On April 12, 1976, the Senate Committee on Banking, Housing and Urban Affairs, which authored the operating subsidy program and is the Senate committee charged with overseeing its implementation, stated in reporting out S. 3295:

"The reserve [fund] is required under Section 236(g) of the Act to be used for additional operating assistance payments under the terms specified in Section 236(f)(3). The Committee is concerned that HUD has not yet implemented this provision of the 1974 Act." S.Rep. No. 94–749, 94th Cong., 2d Sess. 10 (1976).

14. Plaintiffs and the class they represent are suffering and will continue to suffer severe and irreparable injury as a result of the Secretary's failure to implement the operating subsidy program in that they will be forced to pay increased rents out of

funds needed to purchase other basic necessities of life and if they do not pay the excessive rents they will be evicted and thus deprived of a safe, decent and sanitary living environment.

15. Awarding plaintiffs injunctive relief compelling implementation of the operating subsidy program in their behalf will cause no undue harm or prejudice to third parties and will promote the public interest by requiring the Secretary to perform her statutory duties.

### Conclusions of Law

1. The named plaintiffs are adequate representatives of the nationwide class certified in this action.

2. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1337 and 1361; 5 U.S.C. §§ 701–706; and 11 D.C. Code § 521. In addition, the Court may grant declaratory relief pursuant to 28 U.S.C. §§ 2201–2202, there being an actual controversy between the parties.

3. Plaintiffs have no adequate remedy at law.

■ 4. Sovereign immunity is no bar to the award of relief in this action. Sovereign immunity does not extend to acts by an officer of the United States in excess of statutory authority or in derogation of a statutory duty. *E. g., Guadamuz v. Ash,* 368 F.Supp. 1233, 1238 (D.D.C.1973), and cases cited therein. In addition, the National Housing Act waives sovereign immunity by providing in 12 U.S.C. § 1702 that the Secretary may "sue and be sued in any court of competent jurisdiction, State or Federal" in connection with the performance of her duties under the Act. *E. g., Federal Housing Administration v. Burr,* 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940); *Trans-Bay Engineers & Builders, Inc. v. Lynn,* 396 F.Supp. 265, 268 (D.D.C. 1975); *Ghent v. Lynn,* 392 F.Supp. 879 (D.Conn.1975). *See also, United States v. Commonwealth of Pennsylvania,* 394 F.Supp. 261, 265 n. 8 (M.D.Pa.1975).

■ 5. The operating subsidy program established by Sections 236(f)(3) and (g), 12 U.S.C. § 1715z–1(f)(3) and (g), is a mandatory program. *Accord, Ross v. Community Services, Inc.,* 405 F.Supp. 831 (D.Md.1975); *Ross v. Community Services, Inc.,* 396 F.Supp. 278 (D.Md.1975); *DuBose v. Hills,* 405 F.Supp. 1277 (D.Conn.1975); *Abrams v. Hills,* 415 F.Supp. 550 (C.D. Cal.1975), *motion for rehearing denied,* (1976); *Harrison v. Hills,* (W.D.Pa. C.A. No. 75–938, Oct. 1, 1975); *Carberry v. Hills,* (D.Mass. C.A. No. 76–521–F, March 8, 1976); *Parker Square Tenants Association v. HUD,* (W.D.Mo. C.A. No. 75CV577–W–3, Jan. 27, 1976); *Gertsch v. Hills,* 414 F.Supp. 15 (D.Utah C.A. No. C 75–513, March 5, 1976); *Folsom Gardens Action Comm. v. Hills,* E.D.Cal. C.A. No. S–76–43–TJM, Feb. 12, 1976; *Campbell v. HUD,* N.D.Ohio C.A. No. C 75–471, Dec. 22, 1975. The Secretary has been under a ministerial legal duty since 180 days after August 22, 1975, i. e., since February 18, 1976, to establish initial operating expense levels for all Section 236 projects nationwide and to make and contract to make operating subsidy payments for the benefit of plaintiffs and the class they represent from that date.

■ 6. The Secretary is not required to obligate contract authority in order to make operating subsidy payments from the excess rental reserve fund created under Section 236(g). Nor is the Secretary required under that provision to determine that the balance in the fund is adequate to meet estimated operating subsidy payments for all Section 236 projects before making such payments. The Secretary is under a mandatory legal duty immediately to make additional assistance payments for operating subsidies directly from the reserve fund. Moreover, the reserve fund does not become unavailable to make operating subsidy payments on June 30, 1976, but remains indefinitely available for that purpose.

■ 7. The Secretary is required to make operating subsidy payments from the excess rental reserve fund created under Section 236(g) and, to the extent necessary, from unobligated contract authority which is currently available or which shall become available.

8. Transmittal No. 24 is not in conflict with the terms of 12 U.S.C. § 1715z–1. Transmittal No. 24 may be legally implemented retroactively only to the extent that the Department may make refunds to project owners of contributions erroneously made to the reserve fund and provided that such refunds compensate project owners only for basic rentals contributed to the fund.

9. Since there is no genuine dispute as to the material facts and since judgment should be entered for plaintiffs as a matter of law on the issue of whether the operating subsidy provisions of 12 U.S.C. § 1715z–1 are mandatory, plaintiffs' motion for preliminary injunction should be consolidated with the trial on the merits and plaintiffs should be granted summary judgment. Plaintiffs consequently are entitled to declaratory relief in accordance with these conclusions of law. Plaintiffs are also entitled to a writ of mandamus and a permanent injunction ordering the Secretary, her agents, officers, servants, employees, attorneys and all persons in active concert or participation with her to establish initial operating expense levels for all Section 236 projects nationwide, to determine the increase in the cost of local property taxes and utilities for such projects, to determine whether such increases have been reasonable and comparable to cost increases in the relevant community, and to make and contract to make operating subsidy payments for the benefit of plaintiffs from February 18, 1975, forward and to continue to make such payments periodically as the availability of funds permits. Plaintiffs should be denied permanent injunctive relief enjoining permanent implementation of Transmittal No. 24.