**Marion TAYLOR et al.**

v.

**Patricia Roberts HARRIS, Individually and in her official capacity as Secretary of the United States Department of Housing and Urban Development, et al.**

**Civ. No. H–78–86.**

United States District Court,
D. Connecticut.

June 6, 1978.

As Modified Aug. 4, 1978.

---

James C. Sturdevant, Connecticut Legal Services, Rockville, Conn., for plaintiffs.

Lawrence D. Church, Lovejoy, Cuneo & Curtis, South Norwalk, Conn., Raymond L. Sweigart, Asst. U. S. Atty., New Haven, Conn., Maryann Clifford, Department of Justice, Washington, D.C., for defendants.

## RULING ON PENDING MOTIONS

BLUMENFELD, District Judge.

In 1968, Congress established a program to increase the availability of rental housing for low-income families by subsidizing mortgages for housing projects built by nonprofit corporations and other entities. National Housing Act, § 236, 12 U.S.C. § 1715z–1, added by Pub.L.No.90–448, § 201(a), 82 Stat. 498 (1968). Section 236 authorizes the Secretary of HUD to make periodic interest reduction payments on behalf of qualified mortgagors not to exceed the amount necessary to reduce the effective interest payments on the mortgage to one percent per annum. The savings realized by this subsidy are passed on to the tenants in the form of reduced rental payments. "Basic rental charges" are established for each unit at § 236 projects and are determined on the basis of a mortgage amortized at a one percent interest rate. Qualified tenants are required to pay 20 to 25 percent of their "adjusted monthly income" for rent or the "basic rental charge," whichever is greater, but in no event may eligible tenants be required to pay more than a "fair market rent," which is based upon a mortgage amortized at existing interest rates.

In the Housing and Community Development Act of 1974, § 236 was amended to include two additional forms of subsidy. Pub.L.No.93–383, § 212, 88 Stat. 633 (1974). One of these, the operating subsidy, was designed to offset increases in utility costs and real estate taxes through payments to project owners, which would be applied to reduce the rents of low-income tenants. Under the 1968 Act, rents collected in excess of "basic rental charges" were accumulated in a reserve fund. 12 U.S.C. § 1715z–1(g). The 1974 amendment made this fund available for the payment of operating subsidies.[1]

The failure of the Secretary of the Department of Housing and Urban Develop-

1. Until their amendment in 1977, the provisions regarding the operating subsidy program and the reserve fund, 12 U.S.C. § 1715z–1(f)(3), (g), read as follows:

"(3) For each project there shall be established an initial operating expense level, which shall be the sum of the cost of utilities and local property taxes payable by the project owner at the time the Secretary determines the property to be fully occupied, taking into account anticipated and customary vacancy rates. At any time subsequent to the establishment of an initial operating expense level, the Secretary is authorized to make, and contract to make, additional assistance payments to the project owner in an amount up to the amount by which the sum of the cost of utilities and local property taxes exceeds the initial operating expense level, but not to exceed the amount required to maintain the basic rentals of any units at levels not in excess of 30 per centum, or such lower per centum not less than 25 per centum as shall reflect the reduction permitted in clause (ii) of the last sentence of paragraph (1) of the income of tenants occupying such units. Any contract to make additional assistance payments may be amended periodically to provide for appropriate adjustments in the amount of the assistance payments. Additional assistance payments shall be made pursuant to this paragraph only if the Secretary finds that the increase in the cost of utilities or local property taxes, is reasonable and is comparable to cost increases affecting other rental projects in the community.

ment ("HUD") to implement the operating subsidy program provoked a flood of federal litigation. Numerous courts, including this one, held that the program was mandatory and issued preliminary injunctions ordering its implementation. *See, e. g., Abrams v. Hills,* 415 F.Supp. 550 (C.D.Cal.), aff'd, 547 F.2d 1062 (9th Cir. 1976), *cert. granted sub nom. Harris v. Abrams,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977); *Underwood v. Hills,* 414 F.Supp. 526 (D.D.C.1976), *appeal pending,* Nos. 76–1603 & 76–1605 (D.C.Cir.), *stay granted,* 429 U.S. 892, 97 S.Ct. 250, 50 L.Ed.2d 175 (1976); *Dubose v. Hills,* 405 F.Supp. 1277 (D.Conn. 1975), *modified,* 420 F.Supp. 399 (D.Conn. 1976), *subsequent opinion sub nom. Dubose v. Harris,* 434 F.Supp. 227 (D.Conn.1977), *appeal pending,* Nos. 76–6107 & 76–6181 (2d Cir.), *applic'n to vacate stay denied,* 429 U.S. 1085, 97 S.Ct. 1092, 51 L.Ed.2d 531 (1977); *Ross v. Community Services, Inc.,* 396 F.Supp. 278 (D.Md.), *subsequent opinion,* 405 F.Supp. 831 (D.Md.1975), aff'd, 544

F.2d 514 (4th Cir. 1976), *cert. granted sub nom. Harris v. Ross,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977). A nationwide class of plaintiffs was granted a permanent injunction in *Underwood v. Hills, supra,* but relief was stayed by the United States Supreme Court. 429 U.S. 892, 97 S.Ct. 250, 50 L.Ed.2d 175 (1976). In Connecticut, the injunction awarded to a statewide class of plaintiffs was stayed by the Court of Appeals pending an appeal, but an injunction granted to tenants in five § 236 projects remained in effect. *Dubose v. Harris,* 434 F.Supp. 227 (D.Conn.1977). HUD has entered a tentative settlement agreement with the plaintiffs in these actions, which if approved would moot the appeals now pending. Memorandum of Understanding For Settlement of Operating Subsidy Litigation, Jan. 24, 1978.

The operating subsidy provisions were amended by § 206 of the Housing and Community Development Act of 1977, Pub.L. No.95–128, 91 Stat. 1111.[2] As amended, the statute explicitly requires the Secretary of

---

"(g) The project owner shall, as required by the Secretary, accumulate, safeguard, and periodically pay to the Secretary all rental charges collected in excess of the basic rental charges. Such excess charges shall be credited to a reserve fund to be used by the Secretary to make additional assistance payments as provided in paragraph (3) of subsection (f) of this section. During any period that the Secretary determines that the balance in the reserve fund is adequate to meet the estimated additional assistance payments, such excess charges shall be credited to the appropriation authorized by subsection (i) of this section and shall be available until the end of the next fiscal year for the purpose of making assistance payments with respect to rental housing projects receiving assistance under this section. For the purpose of this subsection and paragraph (3) of subsection (f) of this section, the initial operating expense level for any project assisted under a contract entered into prior to August 22, 1974, shall be established by the Secretary not later than 180 days after August 22, 1974."

2. Section 206 of the 1977 Act states:

"(a) Section 236(f)(3) of the National Housing Act is amended by striking out the second and third sentences and inserting in lieu thereof the following: 'The Secretary is authorized to make, and shall contract to make to the extent of the moneys in the reserve fund established under subsection (g)

and to the further extent of funds authorized in appropriation Acts, an additional monthly assistance payment to the project owner up to the amount by which the sum of the cost of utilities and local property taxes exceeds the initial operating expense level. Such payment shall be used by the project owner solely to effect, and there shall be, a reduction in the basic rental charges established for the project. Any contract to make additional monthly assistance payments shall be for a one-year period and shall be adjusted periodically to provide, to the extent approved in appropriation Acts, for continuation of the payments and for an appropriate adjustment in the amount of the assistance payments.'.

"(b) Section 236(f)(3) of such Act is further amended by striking out 'only if the Secretary finds that the increase in the cost of utilities or local property taxes is reasonable and is' in the last sentence and inserting in lieu thereof 'unless the Secretary finds that the increase in the cost of utilities or local property taxes is not reasonable or not'.

"(c) Section 236(g) of such Act is amended by striking out '1974' in the fourth sentence and inserting in lieu thereof '1977'.

"(d) The amendments made by this section shall become effective on October 1, 1977, and shall apply to assistance payments pursuant to section 236(f)(3) of the National Housing Act with respect only to periods commencing on or after such date."

HUD to implement the subsidy program, using the § 236(g) reserve fund and additional appropriations. The subsidy formula was altered to provide for a reduction in the basic rental charges sufficient to offset increases in real estate taxes and utility costs. Under the prior (1974) formulation, the subsidy was calculated separately for each ten- ant and limited to an amount that would reduce their rent to 25 to 30 percent of their adjusted incomes. The amendment took effect on October 1, 1977, but the Secretary was allowed a period of 180 days from its enactment to establish initial operating expense levels as a basis for calculating subsidy payments.[3] Congress has not

---

**3.** The House Conference Report, H.R.Rep.No. 95–634, 95th Cong., 1st Sess. 62–63, *reprinted in* [1977] U.S.Code Cong. & Admin.News 2965, 2982–84, contains the following discussion of the amendment to § 236:

"The House bill contained a provision to amend section 236(f) of the National Housing Act to require the Secretary to make, to the extent approved in appropriations acts, section 236 operating subsidy payments. It also specified that non-insured projects assisted under a State or local program providing assistance through loans, loan insurance, or tax abatement, are eligible for operating subsidies provided under section 236. It also expanded the subsidy coverage to include increases in all operating and maintenance expenses payable by the project owner, rather than only the cost of utilities and local property taxes as under existing law. The period used for establishing the initial operating expense level for a project was changed to the 12-month period following the date on which a project first achieves 50-percent occupancy, and a project became eligible for operating subsidies within 90 days of establishment of the initial operating expense level but not prior to October 1, 1977. It provided that all projects with contracts entered into prior to the enactment of this Act would have their initial operating expense level established within 180 days of the enactment date of this Act. It also authorized contracts to be amended periodically for appropriate adjustments. The Senate amendment also contained provisions to amend section 236(f). It required the Secretary to make, to the extent of moneys in the reserve fund established under section 236(g) and to the further extent of funds authorized in appropriation acts, operating subsidy payments for increases in the cost of utilities and local property taxes above the initial operating expense level established at the time the project became fully occupied. It deleted a provision in existing law basing determination of the amount of subsidy on a percentage of a tenant's income payable for rent for each unit, and required instead that payments be used to reduce basic rental charges established for the project. It also deleted the existing provisions authorizing periodic adjustments in the amount of subsidy payments and required instead single year contracts for payments, with renewals and appropriate adjustments annually to the extent approved in appropriation acts. An existing provision which authorizes payments only if Secretary determines that cost increases are reasonable and comparable to increases affecting other rental projects was amended to authorize payments unless the Secretary found that such cost increases were not reasonable and comparable.

"The conference report contains the House provision, amended to: (1) Direct the Secretary to make additional section 236 operating subsidy payments to cover increases in utility and local property tax costs in excess of initial operating expenses to the extent of funds in the reserve fund and to the further extent of funds authorized in appropriation acts; (2) provide that such payments shall be used to reduce the basic rental charges established in the project; (3) require that contracts for additional monthly assistance payments be made for a one-year period and adjusted annually to the extent approved in appropriation acts; (4) provide that such payments be made unless the Secretary finds such increases to be unreasonable; (5) require the Secretary to establish an initial operating expense level for projects with contracts entered into prior to the enactment of the Housing and Community Development Act of 1977 not later than 180 days after enactment; and (6) provide that the amendments made by these provisions shall be effective on October 1, 1977, and to clarify that they shall be applicable to all assistance payments made with respect to any period commencing after that date.

"The conferees intend by these amendments that the Department of Housing and Urban Development make operating subsidy payments from the reserve fund established under section 236(g), as well as from monies approved in appropriation Acts. The reserve fund is to remain fully available for the payment of such operating subsidies. The conferees are further aware that HUD has asserted in litigation that it does not have sufficient contract authority to make such payments to the full extent of monies in the reserve fund. These amendments are intended to clarify that while the Secretary is authorized to enter into contracts with project owners to make such payments, no contract authority is needed to spend the reserve funds for operating subsidies. It is expected

appropriated any funds for operating subsidies under § 236(f)(3), and the President did not request any such funds in his Budget Message for Fiscal Year 1978. The claims asserted in the present action arise from the 1977 amendment to § 236.

## I.

The plaintiffs are two tenants of Kingsway Apartments, a housing project for low-income elderly persons located in Norwalk, Connecticut. The project, constructed and subsidized under § 236, is owned by King's Daughters and Sons Housing, Inc., a nonprofit corporation organized by the Norwalk Town Union of King's Daughters and Sons. In January 1978, HUD approved an increase in the basic rental charges for Kingsway Apartments, to take effect on March 1, 1978. HUD informed the owner that increases of $23.85 per month for studio apartments and $29.82 for one-bedroom apartments were reasonable due to increases in utility and maintenance costs. If HUD were to pay the owner the maximum subsidy permitted by § 236(f)(3), the plaintiffs would be spared more than 90 percent of the increase.[4]

Plaintiffs Marion Taylor and Olga Kamischny each pay $112.50 monthly for a studio apartment at Kingsway. Under the approved rent increase, each would pay $136.35. The new rent would equal 40.4 percent of plaintiff Taylor's income, or approximately 52.1 percent of her "adjusted

income." 24 C.F.R. § 236.2(a). Plaintiff Kamischny's rent would equal 52.1 percent of her income and approximately 55.6 percent of her "adjusted income." Their complaint alleges that they face severe deprivation and possible eviction, and that there is a serious shortage of low-income housing in the Norwalk area, concluding that irreparable harm to plaintiffs will result from imposition of the increased rents.

The complaint states three causes of action. It is claimed that the Secretary has deprived the plaintiffs of rights under § 236 by failing to pay any subsidies under the 1977 amendment and by approving the rental increase at Kingsway Apartments. Plaintiffs also allege that the owner of Kingsway and its managing agent, Katz Realty, Inc., failed to inform the tenants of HUD's reasons for approving the increase, thereby violating a procedural regulation, 24 C.F.R. § 401.5, and denying the plaintiffs due process of law. They have also joined as a defendant James McIntyre, the Acting Director of the Office of Management and Budget, who is claimed to have violated a duty under article II of the United States Constitution by failing to include a supplemental appropriation for the § 236(f)(3) subsidy program in his Budget Message to Congress on January 23, 1978.

Plaintiffs seek to represent a class of tenants in § 236 projects throughout Connecticut against a corresponding class of project owners.[5] They ask that the project

that the Secretary in making single year contracts for operating subsidy payments will ensure that the contracts contain adequate provisions for all anticipated cost-increases over the term of the contract.

"The conferees intend that these amendments shall not prejudice the rights or liabilities of any party presently before the courts seeking operating subsidy payments pursuant to sections 236(f)(3) and 236(g). The conferees do intend, however, that any relief awarded shall be used by the project owner solely to effect a reduction in the basic rental charges established for the project and actually charged to the tenants of such projects. In addition, while the amendments agreed to give the Department 180 days from the enactment of this act to establish initial operating expense levels for projects financed under section 236; it is the intent of the confer-

ees that additional monthly assistance payments authorized by these amendments shall be made prospectively as of the effective date of these amendments to section 236."

The 1977 Act became law on October 12, 1977, and the 180-day period therefore expired on April 10, 1978.

4. The parties stipulated at the hearing on these motions that more than 90 percent of the approved rent increase reflected increased costs of utility service.

5. The proposed classes are as follows:

"The plaintiff class is comprised of all persons who have resided in any and every Section 236 housing project in the State of Connecticut, who presently reside at any and every Section 236 housing project in the State of Connecticut, or who may reside

owners be enjoined from collecting any portion of a rent increase representing increased utility costs or real estate taxes. They request orders directing that the Secretary of HUD pay subsidies under the 1977 amendments, and requiring defendant McIntyre to request a supplemental appropriation for operating subsidies from Congress. The matter is now before this court on the plaintiffs' motions for class certification and for a preliminary injunction. By the latter motion the plaintiffs seek in the alternative to enjoin the private defendants from collecting the rent increase pendente lite, or to order immediate implementation of the subsidy program.[6] They have reserved their claims against defendant McIntyre for a hearing on the merits.

## II.

The defendant Secretary concedes that under the 1977 amendment, implementation of the operating subsidy program is mandatory. She maintains, however, that she has not failed to perform her duties under the 1977 Act. When these motions were argued, the 180-day period for computation of initial operating expense levels had not yet expired, and the Secretary argued that any relief under the 1977 Act would therefore be premature. She further argues that it would still be premature at this time, when the period has recently expired. The Act allowed 180 days for establishing the initial operating expense levels, which is only an intermediate step in calculating subsidy payments. No deadline was established for making the payments, but the Secretary infers that some reasonable additional period of time was contemplated to complete the implementation process.

Additional time is particularly necessary for implementation, she maintains, because there are insufficient funds available to make the maximum subsidy payments permitted under § 236(f)(3), and HUD must therefore determine how to use its limited funds in the most effective fashion. The § 236(g) reserve fund contained $64,600,000 as of February 28, 1978. However, under the pending settlement of 1974 Act claims, plaintiff classes in the 1974 Act litigation would receive all the money accumulated in the reserve fund as of September 30, 1977; thus only subsequent accumulations are available for 1977 Act subsidy payments. HUD estimates that approximately $140 million would be required to pay the maximum subsidies to all § 236 projects for the year beginning October 1, 1977, but that only $12 million will have accumulated in the reserve fund in the same period. Affidavit of Marilyn Melkonian, Deputy Assistant Secretary, HUD, April 21, 1978, at 2. This affidavit, filed with the court subsequent to the hearing on these motions, sets forth a procedure by which HUD proposes to determine which § 236 projects are most in need of subsidy assistance.[7] The Secre-

there in the future and who were or are eligible on and after October 1, 1977, to have their basic rentals reduced by the payment of an operating subsidy to their Section 236 project owner for increases in utilities (including fuel) and real property taxes above the initial operating expense level established for each Section 236 project. . . .

"The named defendant KINGS DAUGHTERS AND SONS HOUSING INC. represents that class of Section 236 housing project owners in the State of Connecticut who have applied for and been granted rent increases from HUD subsequent to the date when the initial operating expense level should have been established for each of their respective projects or who have experienced any increase in the costs of utilities, including fuel, and/or real property taxes subsequent to the date when the initial operating expense level should have been established for each of

their respective projects, and who were, are, or will be effective on and after October 1, 1977, eligible to receive an operating subsidy to reduce basic rentals established for their respective projects."

Plaintiffs' Substitute Motion for Class Action Certification, at 1–2.

6. In a stipulation between the plaintiffs and the private defendants, it was agreed that a hearing on the motion for preliminary injunction would be postponed to March 15, 1978 and that defendant King's Daughters and Sons Housing, Inc. would refrain from collecting increased rents pending the court's decision on these motions.

7. Ms. Melkonian's affidavit states, at 4–6:

"The projects to be given priority will be selected in the following way:

tary has determined that full subsidy payments to benefit the neediest tenants will do more to accomplish the legislative intentions of the subsidy program than a pro rata distribution to all § 236 projects. She estimates that payments to selected projects will be made under this plan by August 1, 1978. *Id.* at 6.

The project owner and its managing agent argue that the rent ·increase was properly approved by HUD and is necessary to meet increased costs at Kingsway. They oppose a preliminary injunction on three grounds: first, that the propriety of the rent increase is not affected by the availability or unavailability of operating subsidies; second, that tenants will receive cred-

"a. Eliminate all projects in which more than 40 percent of the tenants already receive additional assistance under a HUD program aimed at reducing rentals for lower income persons. This would include the Section 8 Program, the Section 23 Leased Housing program, the Rent Supplement program, and the Rental Assistance Payments program. The rationale for this criterion is that the subsidy provided under each of these programs assists the neediest tenants in a project; that a project with more than 40 percent of its tenants receiving such assistance will not be among those with the greatest proportion of tenants in need of further assistance; and that this initial screening mechanism is essential to reduce the class of potential beneficiaries so that the Department may effectively assess individual tenant need.

"b. Because of the insufficiency of funds relative to demand, the Department is encouraging state and local governments to assist projects they have financed to the extent they can do so. Accordingly, all remaining projects for which an additional subsidy is to be provided will be divided into two categories, i. e., Federally insured projects and non-insured state and local agency projects. The projects in each category will share the money in the reserve fund in proportion to the amount paid into the reserve fund by such projects.

"c. Central Office staff will then rank the projects on the basis of per unit tax and utility cost increases since the date that the initial operating expense level was calculated. For each category, a list of projects experiencing the greatest per unit increases will be made. The list will contain three times our estimate of the number of projects that available funds can serve, so that tenant need can be weighted appropriately in the final selection. We

it for subsidies paid by HUD and thus will suffer no irreparable harm; and third, that a preliminary injunction would impose greater hardships on the owner than the rent increase imposes on the tenants, because collection of the increased rents is necessary to prevent a possible mortgage default or involuntary receivership. Without the rent increase, monthly expenses at Kingsway exceed income by approximately $3,300. Temporary arrangements to reduce mortgage payments . and to suspend payments into a reserve-for-replacements fund may enable the owner to pay most of its current debts, but the debts will mount steadily without an increase in rental income.[8]

propose to complete these lists by May 20, 1978.

"d. For listed projects, the field offices will be directed to obtain tenant rent and income data for very low income tenants, that is, those tenants whose incomes do not exceed 50 percent of the area median and who are receiving no other tenant subsidy. This information should be reflected in project owners' files. We will request that it be forwarded to the Central Office no later than June 15, 1978.

"e. After receiving this information projects will be ranked, within each category, according to a formula which considers the magnitude of per unit tax and utility cost increase, and the rent to tenant income ratio. To the extent of funds available, the Department will prepare and forward to project owners for signature contracts providing for 12 monthly payments in stated amounts. Payments made under those contracts are intended to be in discharge of any statutory obligation that the Secretary may have to provide a tax and utility cost subsidy for the period from October 1, 1977 through September 30, 1978."

8. Kingsway's total debts were $39,793 as of March 31, 1978, and it was estimated that they would be nearly $43,000 by April 30. The mortgagee and HUD agreed to allow the owner to suspend payments into the project's reserve-for-replacements fund for a period of one year, commencing December 1, 1977. This will result in a savings of $9,678. HUD has also tentatively agreed to allow the owner to reduce its mortgage payments for a period of six months in 1978, which would produce a savings of approximately $30,000. It is estimated that Kingsway would still owe approximately $30,000 at the close of that period. One of the project's principal creditors, Connecticut Light

The plaintiffs point out that HUD did not need 180 days in order to calculate initial operating expense levels for § 236 projects in Connecticut. These levels were calculated for nearly all such projects in 1976, while this court's statewide preliminary injunction was in effect in *Dubose v. Hills, supra.* To implement the program in Connecticut, HUD would only have to update its information on current utility costs and real estate taxes.

Plaintiffs charge that HUD has unnecessarily delayed implementation of the 1977 subsidy program. HUD did not distribute a memorandum to inform its local offices of the proper procedures for calculating initial operating expense levels until March 13, 1978, about five months after the amendment was enacted. Peter Barkett, a loan management officer in HUD's Hartford, Connecticut, office, estimated that approximately 90 days would be required to collect the information requested in the March 13 memorandum. Plaintiffs argue that the § 236(g) reserve fund is adequate to provide full subsidies to projects in Connecticut (estimated to total $100,000 per month), if not throughout the nation. If reduced payments are necessary, plaintiffs maintain that they must be made on a pro rata basis, citing *Ross v. Community Services, Inc., supra,* 405 F.Supp. at 836, and *Underwood v. Hills, supra,* 414 F.Supp. at 531–32. For all these reasons, plaintiffs claim that immediate implementation of the 1977 Act in Connecticut is necessary to fulfill its purposes.

As an alternative remedy, plaintiffs argue that it would be proper to enjoin the portion of the rent increase reflecting increased utility costs and real estate taxes. They maintain that the owner and not the tenants should bear the burden of increased costs while the subsidy program is being implemented, and that the Secretary should not have approved a rent increase without considering the fact that an operating subsidy would be available. In their view, the owner of Kingsway would suffer only a temporary deprivation from such an injunction, and it faces no substantial threat of irreparable harm from its current financial situation.

### III.

In this judicial circuit, an application for a preliminary injunction is governed by the following standards:

"To obtain the preliminary relief he seeks the movant must make ' "a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." ' *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1358 (2d Cir. 1976) (emphasis in original), quoting *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973); *see Pride v. Community School Board,* 482 F.2d 257, 264 (2d Cir. 1973). Further, it should be emphasized that such preliminary injunctive relief can be awarded only upon a *clear* showing that the movant is entitled to the relief, *Triebwasser & Katz v. American Telephone & Telegraph Co., supra* at 1358; *Sonesta International Hotels Corp. v. Wellington Associates, supra* at 250, and that in making such a showing the movant bears a heavy burden, *Pride v. Community School Board, supra* at 264." *New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 750 (2d Cir. 1977).

The court of appeals has given this explanation for the difference between the two standards:

and Power Co., has threatened to place the apartments in receivership. On March 29, 1978, it agreed to defer its petition for receivership while the owner makes monthly payments on its arrearage. Affidavit of Ruth Ritz, Vice President, Katz Realty, Inc., April 21, 1978.

The owner and its parent organization, the Norwalk Town Union of King's Daughters and Sons, have an equity of approximately $150,000 in the property, which would of course be jeopardized by receivership or a default on the mortgage.

" '[T]he burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief.' Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., supra, [366 F.2d 373, 375 (2d Cir. 1966)]. In such a case, the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation. Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 205 (2 Cir. 1966); Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., supra; Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953)." *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

See *Triebwasser & Katz v. American Telephone & Telegraph Co., supra,* 535 F.2d at 1359; *San Filippo v. United Brotherhood of Carpenters & Joiners,* 525 F.2d 508, 511 (2d Cir. 1975).

Because these plaintiffs have very low incomes and will suffer severe deprivation if forced to pay the increased rents for their apartments, it may be assumed that they have established a possibility of irreparable injury in the absence of injunctive relief. *Cf. Dubose v. Hills, supra,* 405 F.Supp. at 1292. The remaining task is a determination of whether their claims for injunctive relief will probably succeed or whether they raise "questions . . . so serious, substantial, and difficult as to make them a fair ground for litigation . . . ."

## IV.

█ Plaintiffs' reasons for granting a mandatory injunction requiring HUD to immediately implement the subsidy program do not meet either of these standards. Though Congress has made clear its intention that operating subsidies be made available to benefit tenants such as the plaintiffs, there is no substantial basis at this time for a conclusion that the Secretary has violated a duty imposed by the 1977 amendment. The Secretary's present timetable for implementing the program is an extremely slow one, and tenants have good reason to be dissatisfied with it; but it is not so unreasonable as to violate her statutory duty. Furthermore, plaintiffs cannot obtain the injunctive relief they seek without showing that immediate implementation of the program would benefit them. Under these circumstances, plaintiffs cannot compel the Secretary to make subsidy payments to any particular project in any particular amount. The statute establishes a maximum level for subsidy payments but not a minimum level, and the funds available are clearly insufficient to make the maximum payments to all § 236 projects.[9] In the absence of further legislative guidance, the Secretary has discretion to distribute the available funds in any reasonable manner.

Two other district courts held that actions to compel implementation of the 1977 subsidy program were brought prematurely when the 180-day period for calculation of initial operating expense levels had not yet expired. *Moorehead v. Harris,* 448 F.Supp. 1214 at 1218–19 (N.D.N.Y.1978); *Taylor v. Harris,* No. 4–75 Civ. 640, slip op. at 4–5 (D.Minn. Mar. 10, 1978). The Secretary notes correctly that the calculation of initial operating expense levels is only one step in the implementation process. She has no duty to make subsidy payments by any specific date. *See Moorehead v. Harris, supra,* 448 F. Supp. at 1218. The process is made more difficult by the need to devise an equitable method for distributing limited funds. The Secretary anticipates that payments will be made within four months after the deadline imposed by Congress for calculation of initial operating expense levels. If the process involved only simple

9. HUD has properly determined that money deposited in the § 236(g) reserve fund before October 1, 1977, should be available only for settlement of claims under the 1974 Act. This is consistent with Congress' intention, as noted in the House Conference Report, note 3 *supra,* not to prejudice any rights asserted in litigation under the 1974 Act.

computations based on increased expenses, this delay might be unreasonable in light of Congress' intention that subsidies be paid retroactive to October 1977. But the Secretary has established a more complicated process, see note 7 *supra*, that will require additional time. HUD's performance under the 1977 amendment has not been admirable. However, in contrast to the situation presented in litigation under the 1974 Act, the Secretary is not resisting her obligation to implement the program and is apparently endeavoring in good faith to do so. Since no duty has been violated at this time, judicial interference is unwarranted. *See Moorehead v. Harris, supra,* 448 F.Supp. at 1219.

It is true that, because of this court's order in *Dubose v. Hills, supra,* initial operating expense levels were available for nearly all § 236 projects in Connecticut in 1976. However, HUD is not required to treat Connecticut projects any differently because of their involvement in litigation. Connecticut tenants have no right to be subsidized sooner than tenants in other states. *See Battles Farm Co. v. Hills,* 414 F.Supp. 521 at 523–524 (D.D.C.1977). The subsidy program is a national one, and HUD must give its attention to § 236 projects throughout the nation. Though the reserve fund is adequate to pay maximum subsidies to Connecticut projects, the Connecticut projects cannot obtain a preferred position simply because their tenants are among the first to sue the Secretary.

Plaintiffs' alternative proposition, that payments must be made on a pro rata basis, must also be denied. The cases cited by plaintiffs do not support such a requirement. In *Underwood v. Hills, supra,* 414 F.Supp. at 531, the Secretary was required to make some payments from the reserve fund even though it might be inadequate to meet estimated needs, but the court did not say how the amount of those payments should be determined. In *Ross v. Community Services, Inc., supra,* 405 F.Supp. at 836, the court recognized the Secretary's discretion to distribute limited funds in a reasonable manner:

"If, after implementation of the operating subsidy program, the approval of future applications would deplete the amount of the reserve fund, then, as the Supreme Court observed in *Morton v. Ruiz, supra,* 415 U.S. [199, 230, 94 S.Ct. 1055, at 1072, 39 L.Ed.2d 270 (1974)], the Secretary may 'create reasonable classifications and eligibility requirements in order to allocate the limited funds available to [her] for this purpose.' "

## V.

Plaintiffs seek as an alternative to enjoin the collection of the Kingsway rent increase to the extent that it could be offset by § 236(f)(3) subsidies. The private defendants claim that because of Kingsway's financial difficulties, see note 8 and accompanying text, *supra,* such an injunction would create greater hardships for them than the rent increases create for plaintiffs. If this contention is accepted, then plaintiffs must show probable success on the merits to support their motion for a preliminary injunction. *See Checker Motors Corp. v. Chrysler Corp., supra.* However, there is clearly no ground for enjoining the rent increase based on the facts alleged in the complaint, so it is unnecessary to determine in which direction the "balance of hardships" tips.

Plaintiffs claim that the private defendants failed to comply with procedures governing rent increases in that they did not inform Kingsway tenants of HUD's reasons for approving the rent increase before it went into effect. The regulations governing rent increase procedures, 24 C.F.R. §§ 401.1–401.6, are primarily designed to guarantee that tenant comments on proposed increases will be read and considered by HUD before an increase is approved. The alleged failure to comply with 24 C.F.R. § 401.5 was at most a technical violation which did not prejudice the tenants' right to be heard concerning the rent increase. As such, it is not a ground for enjoining the increase. *Tatro v. Harris,* Civ. No. H–77–69, slip op. at 6–7 (D.Conn. March 1, 1977); *Dew v. McLendon Gardens Associates,* 394 F.Supp. 1223, 1236 (N.D.Ga. 1975).

■ It is plaintiffs' further argument that the Secretary abused her discretion in approving the rent increase because she failed to take into account that a § 236(f)(3) subsidy would be available to the project owner. It must be noted generally that the Secretary has broad discretion in deciding whether to approve proposed rent increases. *See, e. g., Towers Tenants Association v. Grace Housing Development Fund Co.*, 538 F.2d 491, 496 (2d Cir. 1976); *Hahn v. Gottlieb*, 430 F.2d 1243, 1251 (1st Cir. 1970). More specifically, decisions concerning rent increases are properly based on criteria entirely independent of the subsidy program. A rent increase is approved when it is justified by increased expenses, and it is not made illegal because a subsidy is available that could offset some of those expenses. *See Moorehead v. Harris, supra*, 448 F.Supp. at 1220–21; *Johnson v. HUD*, No. 76–979–Civ–JLK, slip op. at 3 (S.D.Fla. Jan. 20, 1977); *Ross v. Community Services, Inc., supra*, 396 F.Supp. at 283.

Plaintiffs rely on three cases where rent increases were enjoined because of the Secretary's failure to implement the 1974 operating subsidy program. *Gibson v. Harris*, 438 F.Supp. 487 (E.D.Va.1977); *Haas v. Harris*, 436 F.Supp. 279 (D.R.I.1977); *Lefort v. Hills*, Civ. No. 76–0286 (D.R.I. Nov. 19, 1976). These courts characterized the issue as one of whether landlords or tenants should bear the burden of increased expenses while judicial appeals were pending and no subsidies were being paid. Their decisions rest substantially on the conclusion that the balance of hardships tipped in favor of the plaintiff tenants. In *Gibson* the court specifically stressed the "balance-of-hardship test" and the public interest "in preventing the eviction of low income tenants." 438 F.Supp. at 491. *Haas* and *Lefort* stressed that "it would . . . be most unfair . . . for defendants to assess plaintiffs the instant increases passing onto them expenses which should have been and should be subsidized." *Haas v. Harris, supra*, 436 F.Supp. at 287, *quoting Lefort v. Hills, supra*, slip op. at 21. To the extent that these courts considered the likelihood that plaintiffs would succeed on the

merits, their discussion primarily concerned whether plaintiffs could require the Secretary to make subsidy payments, and not whether they could prevent the collection of a legitimate rent increase on the ground that a subsidy should have been paid. The *Gibson* court overlooked the latter issue entirely. The *Haas* court said only that Congress' purpose in providing for operating subsidies was "to prevent excessive rent increases." 436 F.Supp. at 287. In *Lefort* the court recognized that "the rent increase procedure is schematically distinct from the operating subsidy program," but said that fact made "little difference"—apparently because of the great irreparable harm faced by plaintiffs. Slip op. at 24–25.

Congress did intend the subsidy program to offset rent increases, but it did not require that unpaid subsidies be reflected in rent increases or tie rent increase decisions to the subsidy program in any way. None of these decisions found any source for the right to enjoin a rent increase. *Cf. Moorehead v. Harris, supra*, 448 F.Supp. at 1220–21. Furthermore, the present situation is distinguishable from that presented in those three cases. In litigation under the 1974 Act, it was clear that sufficient funds were available to make full subsidy payments. *See, e. g., Dubose v. Hills, supra*, 405 F.Supp. at 1292–93. Thus it was assumed that if project owners were enjoined from collecting increased rents, they would eventually be compensated by subsidy payments for amounts not collected. Because of the limited funds available under the 1977 amendment, it is not clear that any particular project will receive a subsidy. *See Moorehead v. Harris, supra*, 448 F. Supp. at 1221. Where plaintiffs cannot establish their right to receive the benefit of subsidies in specific amounts, there is even less reason under the law to enjoin collection of increased rents.

The motion for a preliminary injunction is therefore denied.

## VI.

In this memorandum I have discussed several of the claims advanced by plaintiffs

and held that they state no cause of action. These determinations are made solely for the purpose of ruling on the motion for a preliminary injunction, and they are based solely on the current state of facts. I have relied on the Secretary's representation to the court that payments under the 1977 amendment to § 236 will be made on or before August 1, 1978. If implementation of the program should be delayed any further, or if other developments should alter the parties' positions with respect to these claims, my determinations would be subject to further examination. Thus it remains possible that plaintiffs will prevail on the merits of these claims; and there is also another claim which has not yet been considered.

I turn now to the motion for certification as a class action, which has not been actively opposed by any defendant. Both plaintiff and defendant classes are so numerous as to make joinder of all members impracticable. There are questions of law and fact common to both classes. The claims of plaintiffs and the defenses of the private defendants are typical of their respective classes. The plaintiffs and private defendants, both represented by able counsel, will fairly and adequately protect the interests of their respective classes. Though some relevant facts may differ from one project to another, I find that the questions of law and fact common to all members of both classes predominate over any questions affecting only individual class members. In addition, the parties opposing each class have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Therefore class certification is appropriate under Rule 23(a) and 23(b)(2), Fed.R.Civ.P.

The motion for class certification is granted. The parties may submit proposals for modification of the classes as defined in plaintiffs' motion, within fourteen days of the date of this order.

SO ORDERED.