Vernice DUBOSE et al.

v.

Patricia HARRIS et al.

Claudia WALTER et al.

v.

Patricia HARRIS et al.

Janette LITTLE et al.

v.

Patricia HARRIS et al.

Mae PLEASANT et al.

v.

Patricia HARRIS et al.

Pantaleon MORALES et al.

v.

Patricia HARRIS et al.

Cathy ADAMS et al.

v.

Patricia HARRIS et al.

Merry E. GRUNDMAN et al.

v.

Patricia HARRIS et al.

Joann JOHNSON et al.

v.

Patricia HARRIS et al.

Civ. Nos. H–75–303, H–75–345, H–75–346, H–76–26, N–76–44, H–76–89, H–76–160 and N–76–109.

United States District Court,
D. Connecticut.

Feb. 23, 1979.

James C. Sturdevant, San Fernando Valley Neighborhood Legal Services, Inc., Pacoima, Cal., for plaintiffs in Dubose, Walter, and Johnson.

John A. Dziamba, Connecticut Legal Services, Willimantic, Conn., for plaintiffs in Walter.

Dennis J. O'Brien, Connecticut Legal Services, Willimantic, Conn., for plaintiffs in Dubose.

Raymond R. Norko, Joan E. Pilver, Legal Aid Society of Hartford County, Hartford, Conn., for plaintiffs in Little.

Robert Wenten, Ronald Rosenstein, Connecticut Legal Services, Torrington, Conn., for plaintiffs in Grundman.

Martin N. Korn, Connecticut Legal Services, Danbury, Conn., for plaintiffs in Johnson.

Sue Ann Shay, Neighborhood Legal Services, Hartford, Conn., for plaintiffs in Pleasant.

Bruce A. Morrison, New Haven Legal Assistance Assn., New Haven, Conn., for plaintiff in Morales.

Martin Zeldis, Connecticut Legal Services, New London, Conn., for plaintiffs in Adams.

Maryann Clifford, Civil Div., U. S. Dept. of Justice, Washington, D. C., Kathleen H. McKay, U. S. Dept. of Housing and Urban Development, Washington, D. C., Robert S. Greenspan, U. S. Dept. of Justice, Civ. Div., App. Section, Washington, D. C., Cheryl B. Watley, Asst. U. S. Atty., New Haven, Conn., for the Federal defendants.

## RULING ON STIPULATION FOR SETTLEMENT

BLUMENFELD, District Judge.

These eight lawsuits, which have been consolidated,[1] concern the refusal of the Secretary of the Department of Housing and Urban Development ("HUD") to implement an operating cost subsidy program enacted as Section 212 of the Housing and Community Development Act of 1974, 12 U.S.C. § 1715z–1(f)(3) and (g).[2] That program was designed by Congress to subsidize rising tax and utility costs so that those costs would not have to be borne by either tenants or project owners.

Now before this Court for consideration is the Stipulation for Settlement executed by counsel for plaintiffs and the Secretary of HUD. If approved the Stipulation provides that these and other actions[3] will be compromised and that eligible tenants and project owners nationwide will receive up to approximately $60 million. Before addressing the fairness, reasonableness and adequacy of the proposed settlement, however, it is necessary to detail the history of this litigation.

### I.

### HISTORY

On December 15, 1975, this Court entered a preliminary injunction ordering the implementation of the program at three housing projects in Connecticut federally subsidized pursuant to Section 236 of the National Housing Act, as amended. *Dubose v. Hills*, 405 F.Supp. 1277 (D.Conn.1975). The injunction required the payment of operating subsidies coterminous with the effective date of the rent increases.[4]

In the months following the December 15, 1975, preliminary injunction six more

1. *Dubose v. Hills*, 22 F.R.Serv.2d 476, 478 (D.Conn.1976), *appeal pending on other grounds*, No. 76–6107 (2d Cir.).

2. Pub.L.No.93–383, 88 Stat. 633.

3. *See, e.g., Underwood v. Hills*, 414 F.Supp. 526 (D.D.C.1976), *appeal pending* Nos. 76–1603 and 76–1650 (D.C.Cir.), *stay granted sub nom. Harris v. Underwood*, 429 U.S. 892, 97 S.Ct. 250, 50 L.Ed.2d 175 (1976), *applic'n to vacate stay denied*, 434 U.S. 993, 98 S.Ct. 626, 54 L.Ed.2d 488 (1977); *Underwood v. Hills*, Nos. 76–1603 and 76–1650 (D.C.Cir. Dec. 1, 1978), unreported Order remanding the case to the District Court for consideration of the Settlement Agreement; *Ross v. Community Services, Inc.*, 396 F.Supp. 278 (D.Md.), *subsequent opinion*, 405 F.Supp. 831 (D.Md.1975), *aff'd mem.*, 544 F.2d 514 (4th Cir. 1976), *cert. granted sub nom. Harris v. Ross*, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), *remanded to Dis-*

trict Court for consideration of settlement, 439 U.S. 1001, 99 S.Ct. 607, 58 L.Ed.2d 675 (1978); *Abrams v. Hills*, 415 F.Supp. 550 (C.D.Cal.), *aff'd*, 547 F.2d 1062 (9th Cir. 1976), *cert. granted sub nom. Harris v. Abrams*, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977), *remanded to District Court for consideration of settlement*, 439 U.S. 1001, 99 S.Ct. 607, 58 L.Ed.2d 675 (1978).

4. In October, 1975, temporary restraining orders were issued in each of those three cases. The Secretary was ordered to establish an initial operating expense level at each of the three projects. The orders also restrained her from refusing to pay an operating cost subsidy to the project owner on behalf of those tenants who were paying more than 30% of their adjusted family income for rent.

suits were filed in this District, five of which remain pending. As a result on May 27, 1976, this Court granted the plaintiffs' motion to expand the individual classes certified by project into a statewide class.

> In view of the Secretary's continued refusal to implement the operating cost subsidy program for all Section 236 projects, and the multiplicity of litigation on this issue now developing in the District of Connecticut, the motion to recertify the class is granted. *Dubose, supra,* 22 F.R.Serv.2d, at 477.

The recertified class was

> comprised of all persons who now reside, or may at some future time reside, at one of the 101 housing projects in Connecticut eligible to receive an interest subsidy under Section 236 at which there has been a rent increase and who pay or will pay more than 30% of their "adjusted family income" for rent as of the date the basic monthly rent was determined for each project. *Id.,* at 478 (footnote omitted).

Recognizing that the "same relief [was] necessary to enforce the existing preliminary injunction with respect to the remaining Section 236 projects," HUD was enjoined from refusing to pay subsidies "to each project owner, [now part of the certified class] commencing with the rental payments due June 1, 1976, or the effective date of the rent increases whichever is later." *Id.,* at 478–479.

This Court's Ruling of May 27, 1976, was appealed by the Secretary to the Court of Appeals for the Second Circuit.[5] On September 27, 1976, this Court denied the Secretary's motion to dissolve the May 27, 1976, preliminary injunction based upon the passage of Pub.L.No.94–378, the Housing and Urban Development and Independent Agencies Appropriation Act (Aug. 9, 1976), 90 Stat. 1095. That legislation appeared to alter the uses for the rental reserve fund, 12 U.S.C. § 1715z–1(g), the primary source of payment of the operating subsidy program. The Conference Report provided, however, that "the committee of conference is agreed that this action shall not prejudice any suit now or hereafter before the courts in this area."[6] This Court accordingly concluded based upon this language:

> [T]hat portion of the fund necessary to maintain a *full* operating subsidies program in Connecticut must be so allocated. Only in this way will the relief granted by my earlier orders not be "prejudiced." *Dubose v. Hills,* 420 F.Supp. 399, 403 (footnotes omitted), *appeal pending* No. 76–6181 (2d Cir.).[7]

On October 18, 1976, the Supreme Court issued a stay of permanent injunctive relief against the Secretary in *Harris v. Underwood,* 429 U.S. 892, 97 S.Ct. 250, 50 L.Ed.2d 175 (1976), *staying* 414 F.Supp. 526 (D.D.C. 1976), *appeals pending* Nos. 76–1603 and 76–1650, a national class action challenge to HUD's failure to implement the operating cost subsidy program.[8]

Relying on the Supreme Court's stay in *Underwood,* the Secretary renewed her motion to the Second Circuit for a stay pending appeal of the May 27, 1976, and September 27, 1976, Rulings. On December 27, 1976, the Second Circuit issued a stay. *See also, Dubose v. Harris,* 429 U.S. 1085, 97 S.Ct. 1092, 51 L.Ed.2d 531 (1977), *applic'n to vacate stay denied.*

On May 9, 1977, this Court issued its Ruling on Motion for Contempt filed by the plaintiffs, *Dubose v. Harris,* 434 F.Supp. 227 (D.Conn.1977). Therein, I concluded with-

---

**5.** On June 28, 1976, this Court denied the Secretary of HUD a stay pending appeal. Similarly, on July 20, 1976, the Secretary's motion for a stay of relief was denied by the Second Circuit pending appeal.

**6.** H.R.Rep.No.94–1362, 94th Cong., 2d Sess. (1976), 122 Cong.Rec.H. 7685.

**7.** This appeal was consolidated with the appeal taken by the Secretary from the May 27, 1976, Ruling on Plaintiffs' Motion to Amend Class Certification.

**8.** The nationwide class certified in *Underwood v. Harris* was expressly amended on June 8, 1976, by Judge Pratt to exclude the Connecticut statewide class.

out finding the Secretary in contempt, that HUD's termination of operating subsidy payments to those five Section 236 project owners previously mandated by the preliminary injunction of December 15, 1975, which the Secretary never appealed, was unjustified and that the payments must be resumed back to the date of termination.

Section 206 of Pub.L.No.95–128, 91 Stat. 1111 (Oct. 13, 1977), the Housing and Community Development Act of 1977, revised the 1974 operating subsidy program mandated in 12 U.S.C. § 1715z–1(f)(3) and (g).[9] Accordingly, on June 8, 1978, in the Ruling on Motion to Modify the Court's Order for Injunctive Relief in *Dubose*, this Court held that the 1974 provisions were operative between February 18, 1975 and October 1, 1977. Thereafter the revised operating subsidy program mandated by Section 206 of the 1977 legislation was applicable and operating subsidies previously ordered and paid under the 1974 Act were in the future to be calculated and paid pursuant to the formula in the 1977 Act. Operating subsidy payments under the 1974 Act made under my previous Orders were judicially terminated on November 13, 1978, when this Court approved the Stipulation entered into between plaintiffs and the Secretary for five of the projects involved in these cases.[10]

## II.

## DISCUSSION OF THE BACKGROUND OF SETTLEMENT

The foregoing demonstrates that this litigation was vigorously pursued by plaintiffs and their counsel. But the stays issued by the Supreme Court in *Underwood, supra,* and by the Second Circuit in *Dubose* as well as the grant of review by the Supreme Court in two similar cases[11] cast doubt upon my earlier pronouncement that "the plaintiffs will almost surely succeed in obtaining permanent injunctive relief," *Dubose, supra,* 405 F.Supp., at 1292, and upon the unanimous rejection of the Secretary's claims under the 1974 program by the federal judiciary.[12]

As a result plaintiffs' lead counsel in these and the other three principal cases of *Underwood, Ross,* and *Abrams, supra,* initiated settlement negotiations with counsel for the Secretary of HUD in November, 1977. The culmination of those negotiations was the execution on September 26, 1978 and October 13, 1978 of a Settlement Agreement.[13] On November 8, 1978, plaintiffs and the Secretary in these actions filed their Stipulation for Settlement. After a hearing on November 13, 1978, this Court issued its Order for Hearing on Settlement and ordered notice to be given to members of the statewide classes of tenants and Sec-

9. For a more complete analysis of the revisions *see, Taylor v. Harris,* 452 F.Supp. 88 (D.Conn. 1978). Section 206 of the 1977 legislation has since been replaced by Section 201 of Pub.L. No.95–557, 92 Stat. 2080, the Housing and Community Development Amendments of 1978, which is discussed *infra.*

10. The projects and tenants affected were those in *Dubose, Walter, Little, Adams* and *Pleasant.* The Stipulation provides that HUD will not seek reimbursement of any operating subsidies paid after September 30, 1977, from any tenant or project owner.

11. *Harris v. Ross,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977); *Harris v. Abrams,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977).

12. *See, Ross v. Community Services, Inc.,* 396 F.Supp. 278 (D.Md.1975), 405 F.Supp. 831 (D.Md.1975), aff'd mem. 544 F.2d 514 (4th Cir. 1976); *Harrison v. Hills,* CV No. 74–938 (W.D. Pa.1975); *Campbell v. United States Dept. of Housing & Urban Development,* CV No. 75–471

(N.D.Ohio 1975); *Abrams v. Hills,* 415 F.Supp. 550 (C.D.Cal.1975), aff'd 547 F.2d 1062 (9th Cir. 1976); *Parker Square Tenants Ass'n v. The Dept. of Housing & Urban Development,* CV No. 76–521–F (D.Mass.1976); *Gertsch v. Hills,* 414 F.Supp. 15 (D.Utah 1976); *Sicuro v. Hills,* 415 F.Supp. 553 (C.D.Cal.1976), appeal pending, No. 76–2872 (9th Cir.); *Battles Farm v. Hills,* 414 F.Supp. 521 (D.D.C.1976), appeal pending, No. 76–1641 (D.C.Cir.); *Underwood v. Hills,* 414 F.Supp. 526 (D.D.C.1976), appeals pending Nos. 76–1603 and 76–1650 (D.C.Cir.). *See also, Dussault v. Hills,* CV No. 76–147 (D.N.H. May 23, 1976); *Gibson v. Harris,* 438 F.Supp. 487 (E.D.Va.1977); *Haas v. Harris,* 436 F.Supp. 279 (D.R.I.1977), rev'd sub nom. *Haas v. Howard,* 579 F.2d 654 (1st Cir. 1978); *Lefort v. Hills,* No. 76–0286 (D.R.I. Nov. 19, 1976).

13. The Settlement Agreement superceded the Memorandum of Understanding for Settlement of Operating Subsidy Litigation, dated January 24, 1978.

tion 236 project owners.[14] On the same date a final hearing was scheduled for the full consideration of the proposed settlement by this Court. On January 29, 1979, the final hearing was held [15] and no oral objections were presented.[16]

## III.

## MAJOR TERMS OF THE STIPULATION FOR SETTLEMENT

The Stipulation for Settlement filed in these cases provides that the sum of $59,-872,666.80 be available for distribution on a nationwide basis to eligible tenants and project owners who would have received the benefits of the 1974 operating subsidy program mandated by Congress had the

Secretary of HUD implemented the program without litigation. This sum equals the entire amount deposited by Section 236 project owners nationwide into the excess rental reserve fund, 12 U.S.C. § 1715z–1(g), from February 18, 1975 through September 30, 1977. This is the precise period during which the operating subsidy provisions of Section 212 of Pub.L.No.93–383, the Housing and Community Development Act of 1974, were in effect.[17]

The Stipulation for Settlement provides a formula for selecting eligible recipients, a formula which closely parallels the 1974 statutory enactment.[18] Secondly, the Stipulation provides the formula for the amount of payments each eligible tenant [19] and each

**14.** On the same date this Court granted plaintiff's Motion to Further Amend Class Certification. As recertified the statewide classes were composed of:

All persons who now reside, or have in the past resided, in housing projects in Connecticut federally subsidized pursuant to Section 236 who between February 1, 1975 and September 30, 1977 were paying more than 30% of their "adjusted family income" for rent (25% in those projects in which direct tenant payment of one or more utility charges, except telephone, was approved by HUD), and who were paying during that period for increased property taxes and utilities above the initial operating expense level established for their project which should have been paid for by HUD through tax and utility cost subsidies pursuant to Section 212 of the Housing and Community Development Act of 1974, 12 U.S.C. § 1715z–1(f)(3) and (g).

The statewide Section 236 project owner class consists of 105 such projects.

**15.** Affidavits were filed by plaintiffs' counsel and by the accounting firm ordered to give notice of the proposed settlement to the statewide classes. See, Declaration of James C. Sturdevant Regarding Compliance By Him With The Notice Requirements Prescribed By This Court's Order For Hearing On Settlement; Declaration of Peter B. Frank Regarding Compliance By Price Waterhouse & Co. With The Court's Order For Hearing On Settlement.

**16.** Two written documents entitled "Amicus Briefs" were filed prior to the hearing and are discussed infra.

**17.** On October 1, 1977, the revised operating subsidy program provided for in Section 206 of Pub.L.No.95–128, the Housing and Community Development Act of 1977, became effective. See, Taylor v. Harris, 452 F.Supp. 88 (D.Conn. 1978).

**18.** Paragraph 3a of the Stipulation provides in full:

*Formula for Selecting Eligible Recipients:*
Every tenant who resided in a Section 236 project, including projects financed by state housing agencies, between February 1, 1975 and September 30, 1977, and who paid in excess of 30 percent of his or her adjusted monthly income (as defined in 24 C.F.R. § 236.2(a)(1) and (3)) for rent (25 percent in cases where direct tenant payment of one or more utility charges, except telephone, was approved by HUD), as of the last month of residence in the project, the last month before receiving a federal rental subsidy, or September, 1977, whichever is earlier, will be eligible to receive retroactive tax and utility cost subsidy payments under this settlement. The tenants eligible to share in the distribution of the settlement fund are those who satisfy the requirements of this paragraph 3a and who are members of the class certified in these actions, of the classes in cases specified in paragraph 1, or of a class in any other suit brought to compel payment of tax and utility cost subsidies pursuant to 12 U.S.C. § 1715z–1 who elect to participate in this settlement.

**19.** Paragraph 3b of the Stipulation provides in full:

*Amount of Payments*
Each eligible recipient, as defined in paragraph 3a, shall receive a lump sum payment equivalent to the number of months between February 1, 1975 and September 30, 1977, during which he or she resided in a Section 236 project without receiving an additional federal rental subsidy, multiplied by the tenant's monthly share of the actual increases in tax and utility costs as of September 30, 1977 at that Section 236 project. A tenant's monthly share will be calculated by determining the amount by which

eligible project owner[20] will be eligible to receive. Moreover, with particular applicability to these cases is the subparagraph of the Stipulation which provides that tenants who have already received operating subsidy payments pursuant to Court order shall be entitled to receive a payment under the proposed settlement if the payments provided for in the formula exceed the ones already received.[21]

Finally, in this regard, the Stipulation provides for those situations in which valid claims exceed the amount of the settlement fund or are insufficient to exhaust the fund.[22] In the former case there will be a "pro rata distribution" among all eligible claimants including project owners. In the latter situation any excess remaining in the fund "shall be returned to HUD and shall be credited to the reserve fund established by Section 236(g) of the National Housing Act, as amended." Stipulation for Settlement, para. 3e.

The Stipulation also calls for the employment of Price Waterhouse & Co., a major national accounting firm, to assist in giving notice to tenants and project owners, to distribute and process claim forms, and to administer the distribution of the settlement fund. Stipulation for Settlement, para. 4a. Subject to Court approval the parties have further agreed that the costs of notice, administrative costs incurred by the accounting firm and the investment agent, and the administrative and out-of-pocket costs incurred by plaintiffs' counsel in these and the other three principal cases[23] in connection with obtaining judicial approval of the proposed settlement shall be paid from the settlement fund prior to the payment of claims to eligible recipients. Stipulation for Settlement, para. 4c. However, the Stipulation expressly provides that "none of the sums distributed may be used to pay attorney's fees." Id., para. 3f.

The complexity and comprehensiveness of the Stipulation for Settlement are readily apparent. In addition to the major provisions discussed above, the Stipulation provides in intricate detail for the provision and issuance of final notice and claim forms to all potentially eligible claimants,[24] for HUD to make available data required to determine eligibility and compute payments,[25] and for the procedures under which the costs of mailing notices and claim forms shall be paid by HUD.[26] Finally, the Stipulation provides that the Courts having jurisdiction over the settlement shall retain jurisdiction "[to] determine any issue or dispute relating to the settlement or to payment of claims." Stipulation for Settlement, para. 7.

---

tax and utility costs for the period October 1, 1976 to September 30, 1977 exceed the initial operating expense level established for that Section 236 project and by then dividing that amount by twelve months and by the number of residential units in that project.

20. Paragraph 3d of the Stipulation provides in full:

Where a project owner has been enjoined from collecting a HUD-approved rent increase, or has agreed not to collect such an increase by reason of specific litigation brought on behalf of tenants in that project to compel implementation of the tax and utility cost subsidy provisions of the Housing and Community Development Act of 1974, those sums owing to the eligible tenants of such project for those months in which a HUD-approved increase or a portion thereof was enjoined or forborne will be distributed to the project owner rather than the tenants in an amount not to exceed the portion of the rent increase attributable to increases in taxes and utility costs actually enjoined or forborne by the owner. Any amount owing to the tenant in excess of the amount actually enjoined or forborne by the project owner shall be paid to the tenant. HUD shall inform Section 236 project owners of their potential eligibility for tax and utility cost subsidy payments as a result of enjoined or forborne rent increases.

21. See, paragraph 3c of the Stipulation for Settlement.

22. See, paragraph 3e of the Stipulation for Settlement.

23. Underwood, Ross and Abrams, supra.

24. See, Stipulation for Settlement, para. 6.

25. Id., para. 5.

26. Id., para. 4d.

## IV.

### FAIRNESS AND REASONABLENESS OF THE SETTLEMENT

■ The issue now before this Court is whether the settlement as described above is reasonable, fairly and adequately protects the interests of absent class members, and should therefore be approved. The Court finds that measured against any and all of the criteria relevant to that inquiry, as discussed below, this settlement in all its detail merits the wholehearted approval of the Court.

### A. The Plaintiff Class Gains More By This Settlement Than By Successful Litigation On The Merits.

■ The factors which this Court would ordinarily consider in deciding whether or not a settlement should be approved all involve a comparison between what class members gain by the settlement and what they could obtain by litigation. *See, Newman v. Stein*, 464 F.2d 689, 692 (2d Cir.), *cert. den.* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) and *Levin v. Mississippi River Corporation*, 59 F.R.D. 353, 361 (S.D. N.Y.), *aff'd* 486 F.2d 1398 (2d Cir.), *cert. den. sub nom. Wesson v. Levin*, 414 U.S. 1112, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973), *reh. den.* 415 U.S. 939, 94 S.Ct. 1457, 39 L.Ed.2d 497 (1974) (whether settlement is within the range of reasonableness given the probabilities of ultimate success were the action litigated); *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir.), *cert. den.* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971) (balancing strengths of the plaintiffs' case on the merits against the amount offered by settlement); and *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (weighing the complexity, expense, likely duration of the litigation, and risks of litigation against the plaintiffs' best possible recovery and the ability of defendants to withstand a greater judgment.) *See also, Herbst v. International Tel. & Tel. Corp.*, 72 F.R.D. 85, 90 (D.Conn.1976).

In this case, the plaintiffs as a class will actually realize a greater recovery by this settlement than by ultimate success on the merits. Were plaintiffs in all of the pending operating subsidy cases to pursue litigation and ultimately win, by a favorable ruling of the Supreme Court in *Ross* and *Abrams*, the total amount of money available for distribution to all of the tenants in all of the cases would be the amount in the reserve fund, as of September 30, 1977, an amount approximating $60 million, because no other funds are available for payment of operating subsidies since Congress directed that money deposited into the reserve fund after that date be used for other purposes.[27] By settlement, plaintiffs obtain that exact total recovery—approximately $60 million. Thus, as a group plaintiffs suffer no diminution in total recovery by settling on the terms submitted to the Court for approval. In fact, plaintiffs will probably realize a greater recovery by settling than by prevailing on the merits since the total available for distribution under the settlement is being increased daily by interest earned.[28]

In addition, each individual class member will in all likelihood realize a recovery by settlement equal to the maximum recovery that could have been realized by success on the merits. Each individual's claim will be calculated based on actual increases in taxes and utilities at his or her Section 236 housing project over the actual, relevant period during which the claimant lived in the project. Although it is true that eligibility will be measured as of one of three dates, rather than on a month-by-month basis, that compromise was necessary to make the calculation of claims and administration of the settlement feasible.[29] Exact

---

**27.** *See*, Pub.L.No.95–128, Section 206(a); Pub. L.No.95–557, Section 201(i)(C).

**28.** By Order of Judge Pratt in *Underwood, supra*, filed on January 3, 1979, the settlement sum was transferred to Crocker National Bank on January 11, 1979. The Court is informed that the daily interest on the sum exceeds $15,000.00.

**29.** Indeed, as both the plaintiffs and the Secretary assert, the passage of time and the inadequacy of the records maintained by HUD and the project owners makes it impossible in 1979

mathematical precision is not required, and the persons who will benefit by the settlement nationwide reasonably approximate those who would have benefitted had HUD implemented the operating subsidy program without litigation or pursuant to Court order. *See, e. g., Levin, supra,* 59 F.R.D., at 369, 371; 3 *Newberg on Class Actions,* § 5610a, at 487 (1977).

Further, the settlement ensures that tenants will receive payment more promptly than if the cases proceeded through litigation. Thus the settlement also ensures that a greater number of eligible persons will receive payments than if resolution of this controversy had to await the end of litigation, since tenant turnover causes more claimants to become difficult, if not impossible, to locate the longer distribution of the money available for payment of operating subsidies is delayed.

Moreover, the settlement provides a method for administering distribution of payments in a prompt and efficient manner by Price Waterhouse & Co., an accounting firm of national reputation for excellence and integrity, to be overseen by a committee of experienced counsel thoroughly familiar with and involved in the two major operating subsidy cases—these actions and *Underwood* the nationwide action—who are well attuned to the interests of their clients and all of the issues which might arise during distribution. The operations of Price Waterhouse & Co., supervised by capable counsel, should cost less, proceed more promptly, and result in greater recoveries than administration of the distribution by HUD.[30]

Thus plaintiffs by settling on the terms presented to the Court, will receive more money, sooner, by a method more efficiently administered than if they were to pursue their actions and obtain the best possible litigated recovery. Considering that plaintiffs ran some risk of recovering nothing if they proceeded by litigation, it is extraordinary that they have been able to procure this settlement. The Court is hard-pressed to imagine a case in which a weighing of the benefits of the settlement against the benefits of litigation more strongly favors approval of the settlement.

B. Support For The Settlement By Interested Parties Reaffirms Its Reasonableness.

■ An additional factor bearing on the adequacy and reasonableness of the settlement is the reaction of class members. *City of Detroit v. Grinnell Corp., supra,* 495 F.2d, at 463. All tenant members of the *Dubose* class who appeared in Court at the hearing for final approval expressed support through counsel for the settlement and an understandable interest focused on receiving the substantial recoveries to which the settlement entitles them as soon as possible.

In addition, this Court is informed that attorneys for plaintiffs in approximately forty other suits not directly involved in the negotiations that led to settlement of *Dubose, Underwood, Ross,* and *Abrams* have been informed of the terms of settlement submitted to this Court and invited to resolve their suits on the same terms, through the same claim and distribution process. The Court is informed that counsel for

to determine with precision every tenant's rent/income ratio for each month between February 1, 1975 and September 30, 1977. *See,* plaintiffs' Memorandum of Law in Support of The Proposed Stipulation for Settlement, at 10–11; Declaration of James C. Sturdevant in Support of Settlement, at 13, para. 12; Federal Defendants' Memorandum of Law in Response to *Amicus* Memoranda, at 2.

**30.** Price Waterhouse's preliminary estimates indicate that the cost of its making the distribution would be approximately $2.2 million, while HUD estimated that if it, rather than Price Waterhouse, implemented the operating subsi-

dy program, its administrative costs would be much higher. The estimate of those costs to HUD was given as in excess of $10 million in the Declaration of Fred. W. Pfaender filed in support of the government's application for a stay in the United States Supreme Court in *Underwood, supra.* Further, since HUD could not invest the reserve fund and earn interest, while under the proposed settlement that fund has been invested by an investment agent since January 11, 1979, the settlement will result in a substantial increase in the total amount of money available for payment of subsidies.

plaintiffs in this action and in the nationwide action, *Underwood*, have received to date favorable responses from counsel in nineteen of those other cases indicating their desire to settle on the same terms as presented to this Court.[31]

### C. Objections Made To The Settlement Are Without Merit.

This Court finds to be wholly without merit several criticisms of the proposed settlement raised by the National Association of Housing Managers and Owners (NAHMO), an organization representing the interests of Section 236 project owners.[32]

First, NAHMO suggests that tenants would prefer to have the reserve fund used for prospective subsidies, i. e., for credits against future rents, under the Housing and Community Development Act of 1977, rather than for payment of lump sum, retroactive operating subsidy payments to reimburse tenants for actual financial deprivations experienced between February, 1975 and October, 1977, the period covered by the 1974 Act and the settlement. NAHMO's suggestion is belied by the facts that no tenants have themselves indicated such a preference, that tenants' own counsel have indicated no such preference, and that, on the contrary, individual tenants who appeared at the hearing for final approval and their counsel fully support the use of the settlement fund for retroactive benefits.

NAHMO also suggests that the proposed settlement favors former tenants over current tenants, and that current tenants would object if they were aware of the discrimination. The Court concludes, however, that in fact there is no unequal treatment. All eligible tenants, whether or not they are now residing in a Section 236 project, will receive a payment reflecting the actual harm they suffered between February 1, 1975 and October 1, 1977, payment to be made from money accumulated in the reserve fund as of September 30, 1977. Those current tenants who in addition should benefit under the 1977 Act have available to them funds accumulated since October 1, 1977. The unfortunate fact that more money is needed to fully implement the 1977 Act should not be visited upon past tenants. *Cf. Taylor, supra*, at 96 (D.Conn. 1978).[33]

Further, this Court concludes that utilization of the reserve fund for prospective rent credits would be inappropriate. The 1977 Act provides that all Section 236 tenants, not just the low-income tenants who are represented in the 1974 operating subsidy cases, receive the benefit of operating subsidy payments. Thus, were the settlement fund to be distributed under the 1977 Act, much of it would go to persons who are not members of the classes certified in the 1974 operating subsidy cases, and the benefits accruing to members of those operating subsidy classes would be reduced. Obviously, counsel for plaintiffs would not have been acting in the best interest of their clients had they negotiated such a settlement.

NAHMO urges, nonetheless, that the settlement fund should be distributed prospectively under the 1977 Act because Section 236 project owners would be benefitted thereby. Undoubtedly they would be benefitted, but they should not be so benefitted to the detriment of low-income tenants who

31. *See,* Plaintiffs' Memorandum of Law in Opposition to Motion To File Memorandum as *Amicus Curiae* of the National Association of Housing Managers and Owners, at 3; Plaintiffs' Memorandum of Law in Support of the Proposed Stipulation for Settlement, at 14.

32. As plaintiffs have indicated other than the filing of written appearances by counsel, none of the named Section 236 project owners in these cases nor any member of their statewide class have filed any documents in these cases or any objection to the proposed settlement. Plaintiffs' Memorandum of Law in Opposition to Motion to File Memorandum as *Amicus Curiae* of NAHMO, at 2.

33. It should be noted that new counsel for the statewide plaintiff class certified in *Taylor, supra,* has informed the Court that in his opinion there is no legal basis for his clients to oppose the proposed settlement. *See,* letter of Louis I. Parley to this Court dated January 22, 1979, attached as Exhibit B to Plaintiffs' Memorandum of Law in Opposition to Motion to File Memorandum as *Amicus Curiae* of NAHMO.

were the primary intended beneficiaries of the 1974 Act. Although NAHMO suggests that tenants did not bear the burden of rising property taxes and utilities, and that project owners bore the burden instead, the Court sees no evidence that costs were not passed on to tenants, either directly by increased rents or indirectly by decreased maintenance and services, other than the fact that some project owners may have been enjoined from increasing rents or agreed not to increase rents after being sued by tenants. Such project owners, for whom there is evidence of withheld rent increases, in fact will be reimbursed out of the settlement fund. Stipulation for Settlement, para. 3d. Thus, they have no cause for complaint.

As to the other project owners who might claim that they did not pass on increasing costs, directly or indirectly, the Court can only recognize that it is not administratively feasible, or even possible, to identify such project owners.[34] And, even if it were possible, it is not the function of this Court to remake the settlement agreed to by plaintiffs' counsel and HUD. *See, Levin, supra,* 59 F.R.D., at 361. The settlement is fair and reasonable and will benefit those persons whom Congress primarily intended to benefit when it adopted the 1974 Act. NAHMO's assertion to the contrary, Congress did not intend, in adopting the 1977 Act, to foreclose settlement of the operating subsidy cases on the terms presented to this Court.[35]

In addition to the memoranda of NAHMO, one other document was filed indicating some reservations, not about the settlement, but about the advisability of this Court delaying approval of the settlement. That document consisted of a declaration by counsel in *Abrams*, later supported by a reply memorandum, pointing out that a "dispute" exists between plaintiffs' counsel in this statewide action, the nationwide action *Underwood,* and *Ross,* on the one hand, and plaintiffs' counsel in *Abrams* on the other hand. This dispute apparently involved the contention of counsel in *Abrams* that a Special Master should be appointed by the Court in *Underwood* to oversee distribution, even though the settlement documents signed by counsel in all the settling cases—*Dubose, Underwood, Ross,* and *Abrams*—do not provide for a Special Master. This Court sees no reason to delay its own decision on the fairness and reasona-

---

**34.** Despite having received a copy of the Settlement Agreement, no Section 236 project owner filed an objection with this Court by January 15, 1979, the deadline imposed by this Court for the filing of objections. *See,* Declaration of Peter B. Frank Regarding Compliance By Price Waterhouse & Co. With The Court's Order For Hearing On Settlement, at 1, para. 4 and 2, para. 7.

**35.** The Conference Report to Section 206 of the 1977 Act provides:

The conferees intend that these amendments shall not prejudice the rights or liabilities of any party presently before the courts seeking operating subsidy payments pursuant to sections 236(f)(3) and 236(g). H.R. Conf.Rep.No.95–634, 95th Cong. 1st Sess. 63, rptd. at U.S.Code Cong. & Admin.News, pp. 2965, 2983 (1977).

The Court interprets the following sentence in the Report—". . . relief awarded shall be used by the project owner solely to effect a reduction in the basic rental charges . . ." —to simply require project owners who do receive subsidy payments pursuant to the 1977 Act to use that money for the benefit of ten-

ants, the primary intended beneficiaries of the 1977 Act.

Moreover, as the Secretary has pointed out in her Brief, at 4, the legislative history to Section 201 of Pub.L.No.95–557, the Housing and Community Development Amendments of 1978, contains similar language. The Conference Report accompanying that legislation provides as follows:

The conference report contains the House provision amended such that only funds credited to the Section 236 reserve fund after October 1, 1978, would be limited to use in the program authorized by this section. The conferees adopted this amendment so as to not prejudice the pending dispute between the Department and a class of tenants over the previous lack of use of the Section 236 tax and utility subsidy program. Should a disposition of the dispute be made which leaves unobligated funds in the Section 236 reserve fund, the conferees expect that legislative action will be taken to make such funds available for the program authorized by this section. H.R.Conf.Rep.No.95–1792, 95th Cong.2d Sess. 65, rptd. at U.S.Code Cong. & Admin.News, pp. 6368, 6651 (1978).

bleness of the settlement as expressed in the Stipulation for Settlement signed by plaintiffs' counsel and counsel for the Secretary of HUD in these actions. This Court is satisfied that no Special Master should be appointed, and that the interests of the *Dubose* class will be adequately protected by the administration of the distribution by Price Waterhouse & Co., which has already demonstrated its thorough grasp of the problems of distribution,[36] advised by a group of counsel which includes James C. Sturdevant, who has demonstrated his capabilities to the satisfaction of this Court,[37] and plaintiffs' lead counsel in the *Underwood* case, who have litigated the nationwide action since its inception.[38]

## CONCLUSION

The parties have negotiated a fair, reasonable, and adequate settlement, effectively administered, which will result in payments to eligible claimants and in greater amounts than would be available through ultimately successful litigation. The Stipulation for Settlement is hereby approved with the congratulations of the Court.

SO ORDERED.

## APPENDIX

### STIPULATION FOR SETTLEMENT

WHEREAS these actions were filed in 1975 and 1976 to compel payment of tax and utility cost subsidies by the defendant Secretary of the United States Department of Housing and Urban Development (HUD) on behalf of low-income tenants residing in housing projects subsidized by HUD pursuant to the National Housing Act, 12 U.S.C. § 1715z–1 (Section 236);

WHEREAS this Court on May 27, 1976, certified a plaintiff tenant class of all persons who now reside, or may at some future time reside, at one of the 101 housing projects in Connecticut eligible to receive an interest subsidy under Section 236 at which there has been a rent increase and who pay or will pay more than 30% of their "adjusted family income" for rent as of the date the basic monthly rent was determined for each project;[1] which class by order of June 8, 1976 was explicitly exempted from the nationwide class certified in *Underwood v. Hills*, 414 F.Supp. 526 (D.D.C.);

WHEREAS this Court on May 27, 1976, extended the preliminary injunction previously issued in *Dubose v. Hills*, 405 F.Supp. 1277 (D.Conn.1975), to the statewide plaintiff class ordering the defendant Secretary of HUD to make tax and utility cost subsidy payments from June 1, 1976 forward, pursuant to 12 U.S.C. § 1715z–1(f)(3) and (g);

WHEREAS these actions have been consolidated for trial by this Court;

WHEREAS the Secretary of HUD appealed from the statewide preliminary injunction entered by this Court on May 27, 1976, as modified in *Dubose v. Hills*, 420 F.Supp. 399 (D.Conn.1976), to the United States Court of Appeals for the Second Circuit;

WHEREAS on December 27, 1976, the United States Court of Appeals entered a stay of this Court's statewide preliminary injunction until the stay issued by the Unit-

---

36. *See*, Proposal of Price Waterhouse & Co. to Conduct A Settlement Distribution in Connection with *Underwood v. Hills* and *Dubose v. Hills*, dated August 9, 1978, and letter from Price Waterhouse & Co. to Ms. Patricia M. Tenoso, dated September 6, 1978, both of which have been filed in *Dubose v. Harris*, Civil No. H–75–303 (D.Conn.).

37. *See, Dubose v. Harris*, Transcript of Proceedings on Settlement held on January 29, 1979, at 5.

38. *See*, Rules of Counsel attached as Exhibit D to Declaration of Patricia M. Tenoso in Support

of Settlement filed in *Underwood, supra*, which were attached as Exhibits to Plaintiffs' Memorandum in Opposition to Motion for Permission to File Amicus Brief: Declaration of Catherine M. Bishop filed in these cases.

1. The plaintiffs in these actions have moved this Court to amend its Class Certification Ruling filed on May 27, 1976, so as to conform the class definition to the class of tenants eligible for operating subsidy payments as set forth in paragraph 9 of the Settlement Agreement attached hereto.

ed States Supreme Court in *Underwood v. Harris,* on October 18, 1976, is dissolved;

WHEREAS the plaintiffs and federal defendants in *Underwood v. Harris* will be jointly seeking reference of that case to the District Court from the United States Court of Appeals for the District of Columbia Circuit to consider and implement the Settlement Agreement;

WHEREAS the plaintiffs and defendant Secretary of HUD in these actions and in the other actions mentioned herein desire to settle and dispose of these actions and of the other actions upon the terms and conditions hereinafter set forth;[2]

NOW, THEREFORE, it is hereby agreed as follows:

1. A Stipulation for Settlement containing identical terms to those set forth herein has been, or will be, filed, and court approval will be sought in the appropriate District Courts in *Underwood v. Harris, Harris v. Ross,* and *Harris v. Abrams.*

2. *Settlement Fund.* The plaintiffs and federal defendants, pursuant to paragraph 6 of the Settlement Agreement, will move the District Court in *Underwood v. Harris* to order the Secretary of HUD to pay to _____, an escrow agent selected by plaintiffs' counsel in these actions, and in the other actions listed in paragraph 1 herein, a portion of the money currently credited to the reserve fund established pursuant to 12 U.S.C. § 1715z–1(g) which is equal to the amount credited to that fund as of September 30, 1977 (a sum of $59,872,-666.80). That money will be invested by the escrow agent in obligations guaranteed by the full faith and credit of the United States in order to maximize the sum available for distribution. The money deposited with the escrow agent, plus any interest earned on investment of that money, shall constitute the fund available for payment of claims, as well as for payment of certain costs incurred by plaintiffs' counsel, the escrow agent, and Price Waterhouse and Co., as more fully described and limited below in

paragraph 4c., and for costs of printing notices and claim forms to be sent to class members as required by this settlement and of purchasing envelopes for those notices and forms, as more fully described below in paragraph 6a. and 6b.

3. *Amount of Payments to Eligible Recipient.* The settlement fund shall be distributed to eligible recipients in the manner and in the amounts described below:

a. *Formula for Selecting Eligible Recipients.*

Every tenant who resided in a Section 236 project, including projects financed by state housing agencies, between February 1, 1975 and September 30, 1977, and who paid in excess of 30 percent of his or her adjusted monthly income (as defined in 24 C.F.R. § 236.2(a)(1) and (3)) for rent (25 percent in cases where direct tenant payment of one or more utility charges, except telephone, was approved by HUD), as of the last month of residence in the project, the last month before receiving a federal rental subsidy, or September, 1977, whichever is earlier, will be eligible to receive retroactive tax and utility cost subsidy payments under this settlement. The tenants eligible to share in the distribution of the settlement fund are those who satisfy the requirements of this paragraph 3a. and who are members of the class certified in these actions, of the classes in cases specified in paragraph 1, or of a class in any other suit brought to compel payment of tax and utility cost subsidies pursuant to 12 U.S.C. § 1715z–1 who elect to participate in this settlement.

b. *Amount of Payments.*

Each eligible recipient, as defined in paragraph 3a., shall receive a lump sum payment equivalent to the number of months between February 1, 1975 and September 30, 1977, during which he or she resided in a Section 236 project without

---

**2.** The terms and conditions are taken from the provisions of the Settlement Agreement executed by counsel for the respective parties dated September 26, 1978 and October 13, 1978 (a copy of which is attached hereto).

receiving an additional federal rental subsidy, multiplied by the tenant's monthly share of the actual increases in tax and utility costs as of September 30, 1977 at that Section 236 project. A tenant's monthly share will be calculated by determining the amount by which tax and utility costs for the period October 1, 1976 to September 30, 1977 exceed the initial operating expense level established for that Section 236 project and by then dividing that amount by twelve months and by the number of residential units in that project.

c. Tenants who have received the benefit of tax and utility cost subsidy payments pursuant to court order shall be entitled to receive the difference between the tax and utility cost subsidy payments already made on their behalf pursuant to such court order and the tax and utility cost subsidy payment to which they are eligible under this settlement.

d. Where a project owner has been enjoined from collecting a HUD-approved rent increase, or has agreed not to collect such an increase by reason of specific litigation brought on behalf of tenants in that project to compel implementation of the tax and utility cost subsidy provisions of the Housing and Community Development Act of 1974, those sums owing to the eligible tenants of such project for those months in which a HUD-approved increase or a portion thereof was enjoined or forborne will be distributed to the project owner rather than the tenants in an amount not to exceed the portion of the rent increase attributable to increases in taxes and utility costs actually enjoined or forborne by the owner. Any amount owing to the tenant in excess of the amount actually enjoined or forborne by the project owner shall be paid to the tenant. HUD shall inform Section 236 project owners of their potential eligibility for tax and utility cost subsidy payments as a result of enjoined or forborne rent increases.

e. In the event claims submitted and approved for payment exceed the amount of the settlement fund, including whatever interest may accumulate prior to distribution of the fund and after costs of notice and administration as described in paragraphs 4c. and 6a. and 6b. have been paid, there will be a pro rata distribution of the fund among all eligible claimants, including project owners as defined in paragraph 3d. If claims submitted and approved for payment are insufficient to exhaust the fund, any money which remains after all claims are paid and costs of notice and administration have been paid shall be returned to HUD and shall be credited to the reserve fund established by Section 236(g) of the National Housing Act, as amended.

f. None of the sums distributed may be used to pay attorney's fees.

4. *Distribution of Settlement Fund.*

a. *Employment of Price Waterhouse.*

Plaintiffs' counsel in these actions and in the cases listed in paragraph 1 above obtained estimates of the cost of implementing this settlement from several major accounting firms and, based on those estimates, interviews with the firms, and discussions with and consent of the federal defendants, have selected Price Waterhouse and Co. to assist in giving notice to the plaintiff classes, to distribute and process claim forms, and to administer the distribution of the settlement fund, in the manner described in their "Proposal To Conduct A Settlement Distribution In Connection With *Underwood v. Hills* and *Dubose v. Hills*, August 9, 1978," as modified by letter of Price Waterhouse to Patricia M. Tenoso dated September 6, 1978 and subject to court approval (which documents have been filed in *Dubose v. Harris*, Civil No. H–75–303 (D.Conn.)).

b. *Mechanics of Distribution.*

Price Waterhouse and Company shall, under the direction of plaintiffs' counsel in these actions and in the other cases listed above in paragraph 1, run a limited pilot test of claim forms with the view to designing a claim form which will maximize the accuracy of claims, shall arrange for printing, and for purchase of envelopes for mailing all notices and all claim forms, as de-

scribed in paragraph 6, and shall mail such notices and forms using HUD's franking privilege in the manner described in paragraph 4d. After notices of the final settlement and claim forms have been sent to class members, those class members will have 60 days to submit those forms to Price Waterhouse which will promptly review those forms for completeness and seek additional information from claimants on any incomplete claims. Price Waterhouse will then promptly review all completed claims and notify all claimants of any claims or portions of claims which have been disallowed. Claimants will have 15 days after notification that a claim has been disallowed to contest that adverse determination by Price Waterhouse. After that time, Price Waterhouse will make lump sum payments to all eligible recipients as set forth in paragraphs 3a. and 3b. Price Waterhouse will include with each payment mailed to an eligible claimant a notice explaining the amount of payment and how the amount was calculated. If a claim is rejected, the claimant will receive an explanation of reasons for rejection, such as that tenant income exceeded allowable limits. However, no claims shall be paid pursuant to this paragraph 4b. until this Court and all four District Courts involved in the cases listed in paragraph 1 have given final approval to the settlement and until all costs of administration and distribution have been paid pursuant to paragraph 4c.

c. *Costs of Administration and Distribution To Be Paid From Settlement Fund.*

All costs of administration or out-of-pocket costs, including travel, incurred by plaintiffs' counsel in these actions and in the actions listed in paragraph 1 in connection with obtaining approval of this settlement, administration of the settlement, and distribution of the settlement fund shall be paid from the settlement fund prior to payment of claims pursuant to paragraph 4b., subject to Court approval. In addition, the cost of printing all notices and claim forms as described in paragraph 6, and of purchasing envelopes for mailing such notices and forms shall be paid from the settlement fund prior to payment of claims pursuant to paragraph 4b., subject to Court approval.

All costs incurred by the escrow agent and by Price Waterhouse and Co. in investing, administering, and distributing the settlement fund shall be paid from the settlement fund prior to payment of claims pursuant to paragraph 4b., subject to Court approval; however, all costs incurred by Price Waterhouse prior to final approval of this settlement by this Court and by the District Courts in the other cases listed in paragraph 1, excluding costs of printing notices as described in paragraph 6a. and of purchasing envelopes to mail such notices, shall be paid from the settlement fund only to the extent of the interest accrued by the fund prior to final approval or disapproval of the settlement. Plaintiffs' counsel in these actions, and in the other cases listed in paragraph 1, and Price Waterhouse shall make reasonable efforts to minimize the costs of administration of the settlement and distribution of the settlement fund.

d. *Limited Costs of Administration and Distribution To Be Paid By HUD.*

HUD shall reimburse the United States Postal Service for postage on all communications intended to aid in the implementation of this settlement by arranging with the Postal Service for contractor use of a permit imprint. Once HUD has obtained authorization for Price Waterhouse to present official mail under the permit imprint, Price Waterhouse will submit Postal Service Form 3602, "Statement of Mailing With Permit Imprints," whenever presenting mailings at the particular post office designated as point of entry in the Department's "Application for Contractor Use of Agency Official Mail" submitted to the Postal Service. HUD shall also make a WATS line available for use by plaintiffs' counsel. HUD shall reimburse Price Waterhouse for the cost of assembling and copying documents requested by HUD pursuant to paragraph 4e. It is the intent of the parties that distribution of the settlement fund shall involve no other substantial costs or expenditures by HUD.

### e. HUD Audits and Reviews of Price Waterhouse Expenses and of Distribution.

Price Waterhouse will submit to HUD reports concerning tasks performed by it and its recommendations when it completes the pilot test, prior to commencement of distribution of the settlement fund, and at such other times as HUD may request or as the Court may direct; these reports shall be certified by Price Waterhouse to be accurate and precise. Price Waterhouse will make its books and records relating to the discharge of its functions pursuant to the settlement available for audit at any time upon request of the Government. Price Waterhouse will provide the Government, upon demand, with copies of any document in its possession that relates to the discharge of its functions under the settlement.

5. *Information to be Provided by HUD.* HUD's Central Office shall provide Price Waterhouse, within a reasonable period of time, with a list of every Section 236 project. That list shall include the following information on each project:

- a. Project name;
- b. Project address of record;
- c. HUD's identifying number and suffix;
- d. The HUD region in which the project is located;
- e. The number of rental units in the project;
- f. The date the project reached sustaining occupancy;
- g. The amount by which tax and utility costs for the period from October 1, 1976 to September 30, 1977, exceeded the initial operating expense level established for the project;
- h. An indication as to whether the project is receiving either deep subsidy or rent supplement payments;
- i. The number or percentage of units under contract to receive a federal rental subsidy; and
- j. The name, address, and telephone number of each project's manager or owner, if readily available in HUD files.

To the extent the above information is not available in the HUD Central Office, HUD Field Offices will be requested to send this data directly to Price Waterhouse. HUD will also notify all Field Offices to comply with all reasonable requests made by Price Waterhouse. In addition, the HUD Central Office shall provide to Price Waterhouse:

- k. A listing of HUD Regional and Field Offices, including addresses;
- l. A listing of HUD Section 236 projects for the elderly;
- m. The name and telephone number of HUD field personnel charged with overseeing Section 236 projects in each Field Office; and
- n. A listing of all HUD projects whose tenants received the benefit of a tax and utility cost subsidy pursuant to court order, including the effective date of the court order and the amount of subsidy paid to the project by HUD on a monthly basis.

6. *Notices and Claim Forms.*

a. *Preliminary Notices of Proposed Settlement.*

Notices, as described in paragraphs 6(a)(1) and 6(a)(2), shall be sent to class members in these actions and in the cases listed in paragraph 1 notifying them of preliminary court approval of the settlement and of the hearing on final settlement, as required by this Court and by the District Courts having jurisdiction over the cases listed in paragraph 1.

(1) *Contents of Preliminary Notice.*

The preliminary notice will contain the following information:

(a) A statement informing recipients of notice that if they lived in Section 236 housing for any period of time from February 1, 1975 through September 30, 1977 and paid in excess of 25–30 percent of their adjusted incomes for rent they may be eligible for a retroactive tax and utility cost subsidy payment.

(b) A statement informing recipients of the notice that there will be a hearing to

determine whether the settlement will be approved.

(c) A statement of the date, time, and place of the hearing.

(d) A description of the procedures for filing objections to the settlement.

(e) A statement explaining that if the settlement is approved, a notice of settlement approval, if necessary, and a claim form will be sent to them which must be filled out and submitted in order for them to be paid their share of the settlement fund.

(f) A statement explaining that the recipient of the notice need not appear at the hearing in order to share in the settlement.

(g) The name, address, and telephone number of the person to be contacted regarding questions about the proposed settlement.

(2) *Distribution and Publication of the Preliminary Notice.*

Preliminary notices will be prepared by, and contain the name of, lead counsel in each pending tax and utility cost subsidy case which is to be resolved by this settlement, and will be printed and mailed by Price Waterhouse, with postage prepaid by HUD pursuant to paragraph 4d., to all Section 236 project owners. HUD will instruct project owners to post notices in the projects and to distribute the notices to all tenants currently residing in the projects, and to provide forwarding addresses, if available, to Price Waterhouse for any tenants who have moved since February 1, 1975. HUD shall require project owners to certify to Price Waterhouse, within 15 days, that they have distributed and posted these notices. Price Waterhouse will send notices to all former tenants for whom they have forwarding addresses. Plaintiffs' counsel in these actions and in the other cases listed in paragraph 1 shall cause a copy of the preliminary notice to be published in the newsletters of the Legal Services Corporation, the National Housing Law Project, and other publications directed to legal services attorneys

and their clients. HUD shall announce the proposed settlement of these cases in a special news release and shall duplicate the preliminary notice in its Consumer Affairs Letter, HUD Newsletter, and HUD Challenge. Additional notice shall be undertaken if required by the Courts. All costs of preliminary notice shall be paid from the settlement fund.

b. *Final Notices of Settlement and Claim Forms.*

Final notice of Court approval of the settlement and distribution of claim forms shall be accomplished in the following manner, as required by this Court and by the District Courts having jurisdiction over the cases listed in paragraph 1.

(1) *Notice to Current and Future Tenants.*

After final approval of the settlement by the necessary Courts, HUD shall require project owners to deliver or mail to each current tenant in their Section 236 projects and to each applicant on the project owners' waiting lists for admission to the project, and post in three conspicuous places in each project, a notice of the final settlement and claim form to be printed by, and supplied to HUD by, Price Waterhouse. HUD shall require project owners to certify to Price Waterhouse that they have posted these notices at the project and have given the notice and claim form to all current tenants and persons on their waiting lists. Names and addresses including apartment numbers of current tenants shall be provided to Price Waterhouse. Price Waterhouse shall provide HUD with a list of all projects which have failed to certify compliance.

(2) *Notice to Former Tenants.*

To the extent such information is available, HUD shall require project owners to forward to Price Waterhouse the name and last known address of any of their former tenants who lived in their projects from February 1, 1975 through September 30, 1977, for whom such information was not already provided. HUD shall

require project owners to certify to Price Waterhouse that all available forwarding addresses have been sent to Price Waterhouse, and Price Waterhouse will send a notice and claim form to every tenant for whom it has received a forwarding address.

(3) *Publication of Final Notice.*

Plaintiffs' counsel in these actions and other cases listed in paragraph 1 shall cause notice of the final settlement of this litigation to be published in the newsletters of the Legal Services Corporation, the National Housing Law Project and other publications directed to legal services attorneys and their clients. HUD shall duplicate the notice of settlement and claim form in its Consumer Affairs Letter, HUD Newsletter, and HUD Challenge. HUD shall also send to all Public Housing Authorities and to a manager or owner of all federally assisted projects a copy of the notice of settlement and claim form and request them to post the notice and claim form in three conspicuous places in each project. Additional notice shall be undertaken if required by the Courts. All costs of giving final notice and of distributing claim forms shall be paid from the settlement fund.

c. *Failure of Project Owners to Cooperate in Distribution of Preliminary and Final Notices and Claim Forms.*

If Price Waterhouse informs HUD that it has not received a certification from a project owner that the notices of settlement and claim forms have been posted and sent to all current tenants, HUD shall promptly notify current tenants and post the notices and claim forms in three conspicuous places in that project. If Price Waterhouse informs HUD that it has not received from a project owner a certification that the notices of settlement and claim forms have been sent to all project applicants or that project owners failed to certify that a list of all available forwarding addresses of tenants who have moved out and a list of all current tenants have been provided, HUD

shall promptly notify project owners that these submissions are required and shall take other appropriate and necessary action to assure compliance.

d. *Bilingual Notices and Form of Envelopes.*

All notices and claim forms shall be printed in English on one side of the document and in Spanish on the reverse. All documents mailed to tenants shall be in envelopes marked "Important Notice—Please Forward" which shall be mailed with postage prepaid by HUD pursuant to paragraph 4d.

7. *Final Disposition of Operating Subsidy Cases.* In the event this Court and the District Courts in the other cases listed in paragraph 1 approve the settlement, and the settlement fund is distributed pursuant to paragraph 4b., the parties in these actions will file a joint motion in this Court for the entry of a judgment of dismissal pursuant to this paragraph. The District Courts having jurisdiction over the cases resolved by this settlement shall, if necessary, determine any issue or dispute relating to the settlement or to payment of claims. In the event the settlement is not finally approved in these cases and in all the cases listed in paragraph 1, or in the event the settlement cannot ultimately be effectuated, the settlement fund plus accumulated interest will be restored to HUD, less the costs of administration described in paragraph 4c. incurred to date; in either event, the parties in these actions and in the other cases listed in paragraph 1 will consent to the reimposition of the existing judgments, stays, and preliminary injunctions, and restoration of the cases to the dockets of the courts where they were docketed as of October 1, 1978. Once the existing judgments, stays, and preliminary injunctions have been reimposed and the cases restored to the dockets of the courts where they were as of October 1, 1978, the parties reserve the right to contest and to seek to vacate or otherwise remove those judgments, stays, and preliminary injunctions.

8. *Miscellaneous.*

a. *Use of Information.*

Any information supplied by HUD to Price Waterhouse shall be used exclusively for the purpose of implementing this settlement.

b. *Effect of Subsidies on Other Governmental Benefits.*

It is the intent of the Secretary of HUD and of the undersigned attorneys for plaintiffs that any retroactive tax and utility cost subsidy payment which is made pursuant to this settlement will have no effect whatsoever on any other need based governmental benefits to which recipients of subsidy payments are eligible or entitled. It is further agreed that any payments made pursuant to this settlement shall not be included as income, resources or assets under any HUD program where eligibility or continued eligibility is defined in terms of a family's or individual's income, resources or assets. The Secretary of HUD shall notify all HUD offices and project owners or managers of this provision and shall provide the undersigned plaintiffs' counsel with a copy of such notification. HUD shall also notify the United States Department of Health, Education and Welfare and the United States Department of Agriculture of this settlement and urge that these Departments not treat any payments made under this settlement as income, resources or assets in determining eligibility for governmental benefits in any program administered by these Departments.

c. *Effect of Settlement on Tenants' and Project Owners' Other Rights.*

This settlement shall not prejudice or limit in any way, including by operation of the principles of *res judicata* or *collateral estoppel*, the rights of tenants in Section 236 housing projects provided for and protected under Section 206 of the Housing and Community Development Act of 1977, Pub.L.No.95–128, nor shall this settlement prejudice the right of a Section 236 project owner to seek any rent increase that may be approvable or obtain any increase approved, by HUD.

### SETTLEMENT AGREEMENT

#### I

1. Counsel for the plaintiff tenants and for the federal defendants in certain cases brought to compel the payment of tax and utility cost subsidies on behalf of tenants in Section 236 federally subsidized housing hereby agree to the provisions set forth herein, in addition to those contained in their Memorandum of Understanding dated January 24, 1978, in settlement of the following cases: [1]

*Underwood v. Harris,* Nos. 76–1603 & 1650 (D.C.Cir.); *Dubose v. Harris,* Civil No. H–75–303 (D.Conn.); *Walter v. Harris,* Civil No. 75–345 (D.Conn.); *Little v. Harris,* Civil No. 75–346 (D.Conn.); *Pleasant v. Harris,* Civil No. H–76–26 (D.Conn.); *Morales v. Harris,* Civil No. N–76–44 (D.Conn.); *Adams v. Harris,* Civil No. H–76–89 (D.Conn.); *Grundman v. Harris,* Civil No. H–76–160 (D.Conn.); *Johnson v. Harris,* Civil No. H–76–109 (D.Conn.); *Harris v. Ross,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243; *Harris v. Abrams,* 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243

2. Consistent with the Memorandum of Understanding this Settlement Agreement reflects an arrangement whereby the Secretary will pay to the court in *Underwood* the amount credited to the reserve fund as of September 30, 1977 for distribution to past and present Section 236 tenants who would have qualified for tax and utility cost subsidies prior to October 1, 1977. It is the intent of the parties that any plan for distribution shall involve no substantial costs or expenditures by HUD.

3. Pursuant to paragraph 3a of the January 24, 1978 Memorandum of Understanding, plaintiffs' counsel have obtained estimates of the cost of implementing the plan for distribution of the settlement fund

[1] In the event of a conflict between the Settlement Agreement and the Memorandum of Understanding the provisions of this document will govern.

contained herein. An estimate is set forth in the Proposal To Conduct A Settlement Distribution In Connection With *Underwood v. Hills* and *Dubose v. Hills* prepared by Price Waterhouse & Co. and dated August 9, 1978. Plaintiffs' counsel will undertake to employ Price Waterhouse, a major national accounting firm, to assist in giving notice to the plaintiff class, to process claim forms, and to distribute the settlement fund as described in their Proposal, subject to approval by the appropriate courts. Costs of administration will be deducted from the fund prior to distribution.

4. Upon execution of this agreement, plaintiffs' counsel in the cases listed in paragraph 1 shall contact counsel for plaintiffs in the approximately 40 additional lawsuits which were filed to compel implementation of the tax and utility cost subsidy program established by the Housing and Community Development Act of 1974 to determine whether those plaintiffs desire to join in the terms of this Settlement Agreement.

5. (a) Upon execution of this agreement, the federal defendants will file, and the plaintiffs will consent to, a motion in *Harris v. Ross*, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, and *Harris v. Abrams*, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243, to refer those cases to the district courts to consider and implement the Settlement Agreement, the Supreme Court, however, retaining jurisdiction. In the event the Settlement Agreement is approved and the settlement fund disbursed pursuant to paragraph 9, the parties will file a joint motion in the Supreme Court in *Ross* and *Abrams* to vacate the judgments and remand these cases for entry of the judgments of dismissal pursuant to paragraph 8, infra.

(b) Similarly, upon execution of this agreement, the federal defendants will file, and the plaintiffs will consent to, a motion in *Underwood v. Harris*, C.A.D.C., Nos. 76–1603 and 1605, to refer that case to the district court to consider and implement the Settlement Agreement, the court of appeals, however, retaining jurisdiction of the appeals. In the event the district court

approves the settlement, and the settlement fund is distributed pursuant to paragraph 9, infra, the parties will file a joint motion in the court of appeals to vacate the judgment and remand the case for entry of the judgment of dismissal pursuant to paragraph 8, infra. The parties intend that the stay of the judgment entered by the Supreme Court shall remain in effect pending the district court's consideration and implementation of the Settlement Agreement.

(c) In the district courts, in *Dubose* and the other Connecticut cases, and in *Underwood, Ross,* and *Abrams*, the plaintiffs and the federal defendants will jointly move the District Courts to approve the settlement.

6. The Secretary will pay the amount credited to the excess rental reserve fund as of September 30, 1977 (a sum of approximately $60 million) for distribution pursuant to paragraph 9 of this agreement. The Secretary shall pay the entire settlement fund to the district court in *Underwood* upon entry of an order by that court authorizing the payment pending final settlement approval. This settlement fund shall not be disbursed pursuant to paragraph 9 until all four district courts in the cases specified in paragraph 1 have approved the settlement, except that costs incurred by the accounting firm prior to final approval may be paid out of this fund to the extent of the interest accrued by the fund. As soon as the court of appeals refers *Underwood* to the district court, pursuant to paragraph 5(b), the district court in *Underwood* will be requested jointly by counsel for plaintiffs and defendants to authorize payment of the fund to a trustee or escrow agent, selected by plaintiffs' counsel, who shall invest that sum in obligations guaranteed by the full faith and credit of the United States in order to maximize the sum available for distribution.

7. In the event the settlement is not approved in all the cases specified in paragraph 1 or in the event the settlement cannot ultimately be effectuated, the settlement fund plus accumulated interest will be restored to HUD, less the costs of administration incurred to date. In either event the parties will consent to the reimposition

of the existing judgments, stays, and preliminary injunctions, and restoration of the cases to the dockets of the courts where they are at the present time. Once the existing judgments, stays, and preliminary injunctions have been reimposed and the cases restored to the dockets of the courts where they are at the present time, the parties reserve the right to contest and seek to vacate or otherwise remove those judgments, stays, and preliminary injunctions.

8. The Stipulation of Settlement shall provide that the respective courts shall, if necessary, determine any issue or dispute relating to the settlement or to payment of claims. After distribution of the settlement fund has been completed, final judgments of dismissal will be entered in all cases resolved by this settlement.

## II

9. The settlement fund shall be distributed to the recipients in the manner, and in the amounts, described below:

(a) *Formula for Selecting Recipients.* Every tenant who resided in a Section 236 project, including projects financed by state housing agencies, between February 1, 1975 and September 30, 1977, and who paid in excess of 30 percent of his or her adjusted monthly income (as defined in 24 C.F.R. § 236.2(a)(1) and (3)) for rent (25 percent in cases where direct tenant payment of one or more utility charges, except telephone, was approved by HUD), as of the last month of residence in the project, the last month before receiving a federal rental subsidy, or September 1977, whichever is earlier, will be eligible to receive retroactive tax and utility cost subsidy payments. The tenants eligible to share in the distribution of the settlement fund are those who satisfy the requirements of this subparagraph and who are members of the classes in cases specified in paragraph 1 or of a class in any other suit brought to compel payment of tax and utility cost subsidies who elect to participate in this settlement.

(b) *Amount of Payments.* Each eligible recipient as defined in paragraph 9 shall receive a lump sum payment equivalent to the number of months between February 1, 1975 and September 30, 1977, during which he or she resided in a Section 236 project without receiving an additional federal rental subsidy, multiplied by the tenant's monthly share of the actual increases in tax and utility costs for the period October 1, 1976 to September 30, 1977, over the initial operating expense level. The tenant's monthly share will be calculated by determining the actual increases in tax and utility costs over the initial operating expense level for each Section 236 project and dividing by twelve months and by the number of residential units in each project.

(c) Tenants who have received the benefit of tax and utility cost subsidy payments pursuant to court order shall be entitled to receive the difference between the tax and utility cost subsidy payments already made on their behalf and the monthly tax and utility cost subsidy to be distributed under this plan.

(d) Where a project owner has been enjoined from collecting a HUD-approved rent increase, or has agreed not to collect such an increase by reason of specific litigation brought on behalf of tenants in that project to compel implementation of the tax and utility cost subsidy provisions of the Housing and Community Development Act of 1974, those sums owing to the eligible tenants of such project for those months in which a HUD-approved increase or a portion thereof was enjoined or forborne will be distributed to the project owner rather than the tenants in an amount not to exceed the portion of the rent increase attributable to increases in taxes and utility costs actually enjoined or forborne by the owner. Any amount owing to the tenant in excess of the amount actually enjoined or forborne by the project owner shall be paid to the tenant. HUD shall inform Section 236

project owners of their potential eligibility for tax and utility cost subsidy payments as a result of enjoined or forborne rent increases.

(e) In the event claims on the reserve fund exceed the amount in the fund as of September 30, 1977, plus whatever interest may accumulate prior to distribution of the fund, there will be a pro rata distribution of the fund among all eligible claimants, including project owners as defined in subparagraph (d), after costs of administration have been paid. If the claims made are insufficient to exhaust the fund, any funds which remain after all claims are paid shall be returned to the Secretary and shall be credited to the reserve fund established by Section 236 of the National Housing Act, as amended.

(f) None of the sums distributed may be used to pay attorneys' fees.

10. Plaintiffs' counsel shall prepare and submit to the appropriate district courts a Stipulation of Settlement, containing all terms of their agreement, and providing in addition that notice of the proposed settlement be given to members of the plaintiff classes, subject to court approval.

(a) This preliminary notice will:

1) inform tenants that if they lived in Section 236 housing for any period of time from February 1, 1975 through September 30, 1977 and paid in excess of 25 percent of their adjusted incomes for rent they may be eligible for a retroactive tax and utility cost subsidy payment,

2) inform them that there will be a hearing on whether the settlement will be approved,

3) state the date, time and place of the hearing,

4) notify them of the procedure for filing objections,

5) explain that if the settlement is approved a notice of settlement approval, if necessary, and claim form will be sent to tenants which must be filled out and submitted in order for the tenant to be paid his or her share of the settlement monies,

6) explain that the tenant need not appear at the hearing in order to share in the settlement, and

7) give the name, address and telephone number of the person to be contacted regarding questions about the proposed settlement.

(b) This preliminary notice will be prepared by, and contain the name of, lead counsel in each pending tax and utility cost subsidy case which is to be settled, and will be mailed with postage prepaid by HUD to all Section 236 project owners. HUD will instruct project owners to post notices in the projects and to distribute to all tenants currently residing in the projects, and, where available, to provide forwarding addresses to plaintiffs' accounting firm for any tenants who have moved since February 1, 1975. HUD shall require project owners to certify to plaintiffs' accounting firm, within 15 days, that they have distributed and posted these notices. Plaintiffs' accounting firm will send notices to all former tenants for whom they have forwarding addresses.

(c) Plaintiffs' counsel shall cause a copy of the preliminary notice to be published in the newsletters of the Legal Services Corporation, the National Housing Law Project, and other publications directed to legal services attorneys and their clients. HUD shall announce the proposed settlement of these cases in a special press release and shall duplicate the preliminary notice in its Consumer Affairs Letter, HUD Newsletter, and HUD Challenge. Additional notice shall be undertaken if required by the respective courts in which the settling cases are pending, with costs to be paid from the settlement fund.

11. Final notice of settlement and distribution of claim forms shall be accomplished in the following manner.

(a) *Current and future tenants.* After approval of the settlement by the necessary courts, HUD shall require project owners to deliver or mail to

each current tenant in a Section 236 project and to each applicant on the project owners' waiting lists for admission to the project, and post in three conspicuous places in each project, a notice of the final settlement and claim form. HUD shall require project owners to certify to plaintiffs' accounting firm that they have posted these notices at the project and have given the notice and claim form to all current tenants and persons on their waiting lists. Names and addresses including apartment numbers of current tenants shall be provided to plaintiffs' accounting firm. Plaintiffs' accounting firm shall provide HUD with a list of all projects which have failed to certify compliance.

(b) *Former tenants.* To the extent such information is available, HUD shall require project owners to forward to the accounting firm employed by plaintiffs' counsel the name and last known address of any of their former tenants who lived in their projects from February 1, 1975 through September 30, 1977, for whom such information was not already provided. HUD shall require project owners to certify to plaintiffs' accounting firm that all available forwarding addresses have been sent to the firm, and the firm will send a notice and claim form to every tenant for whom it has received a forwarding address.

(c) Plaintiffs' counsel shall cause notice of the final settlement of this litigation to be published in the newsletters of the Legal Services Corporation, the National Housing Law Project and other publications directed to legal services attorneys and their clients. HUD shall duplicate the notice of settlement and claim form in its Consumer Affairs Letter, HUD Newsletter, and HUD Challenge. HUD shall also send to all Public Housing Authorities and to a manager or owner of all federally assisted housing projects a copy of the notice of settlement and claim form and request them to post the notice and claim form in three conspicuous places in each project. Additional notice shall be undertaken if required by the respective courts in which these settling cases are now pending, with costs to be paid from the settlement fund.

(d) If plaintiffs' accounting firm informs HUD that it has not received a certification from a project owner that the notice of settlement and claim form has been posted and sent to all current tenants, HUD shall, for that project, promptly notify current tenants and post the notices and claim forms in three conspicuous places. If plaintiffs' accounting firm informs HUD that it has not received from a project owner a certification that the notice of settlement and claim form has been sent to all project applicants or that project owners failed to certify that a list of all available forwarding addresses of tenants who have moved out and a list of all current tenants has been provided, HUD shall promptly notify project owners that these submissions are required and shall take other appropriate and necessary action to assure compliance.

12. All notices and forms which are sent to tenants shall be printed in English on one side of the document and in Spanish on the reverse. All documents mailed to tenants shall be in envelopes marked "Important Notice—Please Forward," which shall be mailed with postage prepaid by HUD. Plaintiffs' accounting firm shall arrange for the printing of these forms and prepare them for distribution.

13. HUD shall reimburse the United States Postal Service for postage on all communications intended to aid in the implementation of this Settlement Agreement by arranging through the Postal Service for contractor use of a permit imprint. Once HUD has obtained authorization for the accounting firm to present official mail under the permit imprint, the accounting firm will be required to submit Postal Service Form 3602, "Statement of Mailing With

Permit Imprints," whenever presenting mailings at the particular post office designated as point of entry in the Department's "Application for Contractor Use of Agency Official Mail" submitted to the Postal Service.

14. HUD shall also make a WATS line available for use by plaintiffs' counsel. All other costs of administration or out of pocket costs incurred by plaintiffs' counsel and their accounting firm in connection with the distribution shall be paid from the settlement fund.

15. The mechanics of distribution of the settlement fund will be handled by the plaintiffs' accounting firm. After notices of the final settlement and claim forms have been sent to class members, they will have 60 days in which to submit those forms to the accounting firm. The firm will promptly review those forms for completeness and seek additional information from claimants on any incomplete claims. The firm will then promptly review all completed claims and notify all tenants of any claims or portions of claims which have been disallowed. Tenants will have 15 days after notification that a claim has been disallowed to contest that adverse determination by the accounting firm. After that time, the firm will make lump sum payments to all eligible recipients as set forth in paragraph 9 of this agreement. With each payment mailed to an eligible claimant there will be a notice explaining the amount of payment and how the amount was calculated. If a claim is rejected, the claimant will receive an explanation of reasons for rejections, such as that tenant income exceeded allowable limits.

### III

16. HUD Central Office shall provide plaintiffs' accounting firm within a reasonable period of time with a list of every Section 236 project. That list shall include the following information on each project:

(a) project name;

(b) project address of record;

(c) HUD's identifying number and suffix;

(d) HUD region in which the project is located;

(e) number of rental units in the project;

(f) the date the project reached sustaining occupancy;

(g) the increase in tax and utility costs as of September 30, 1977, over the initial operating expense level for the project;

(h) indication as to whether the project is receiving either deep subsidy or rent supplement payments;

(i) the number or percentage of units under contract to receive a federal rental subsidy;

(j) the name, address, and telephone number of each project's manager or owner, if readily available in HUD files.

To the extent this information is not available in HUD Central Office, HUD Field Offices will be requested to send this data directly to the accounting firm. HUD will also notify all Field Offices to comply with all reasonable requests made by plaintiffs' accounting firm.

In addition, HUD Central Office shall provide to the accounting firm:

(*l*) a listing of HUD Regional and Field Offices, including addresses;

(m) a listing of HUD Section 236 projects for the elderly;

(n) the name and telephone number of HUD field personnel charged with overseeing Section 236 projects in a given Field Office; and

(o) a listing of all HUD projects whose tenants received the benefit of a tax and utility cost subsidy pursuant to court order including: the effective date of the court order and the amount of subsidy paid to the project by HUD on a monthly basis.

17. Any information supplied by HUD to the plaintiffs' accounting firm shall be used exclusively for the purpose of implementing the settlement of this litigation.

18. It is the intent of the Secretary of HUD and of the undersigned attorneys for tenants that any retroactive tax and utility cost subsidy payment which is made pursuant to this settlement agreement will have no effect whatsoever on any other need based governmental benefits to which the tenants are eligible or entitled. It is fur-

ther agreed that any payments made pursuant to this settlement agreement shall not be included as income, resources or assets under any HUD program where eligibility or continued eligibility is defined in terms of a family's or individual's income, resources or assets. The Secretary shall notify all HUD offices and project owners or managers of this provision and shall provide plaintiffs' counsel with a copy of such notification. HUD shall also notify the Department of Health, Education and Welfare and the Department of Agriculture of this settlement and urge that these Departments not treat any payments made under this settlement as income, resources or assets in determining eligibility for governmental benefits in any program administered by these Departments.